1          UNITED STATES DISTRICT COURT

2        FOR THE EASTERN DISTRICT OF WISCONSIN

3             MILWAUKEE DIVISION
------------------------------------------------------

4
JENNIFER VANG,
5  on behalf of herself
and all others
6  similarly situated,

7                Plaintiff,

8        -vs-              CASE NO.:  09CV000842

9  KOHLER CO.,
a domestic corporation,
10
                Defendants.
11
------------------------------------------------------------

12

13          Examination of **APRIL FLEISCHMANN**, taken at the

14  instance of the Defendant, under and pursuant to the

15  provisions of Section 804.05 of the Wisconsin Statutes,

16  pursuant to Stipulation, before *SHARON KAY BEYER*, a

17  Registered Professional Reporter and Notary Public, in and

18  for the State of Wisconsin, taken at the offices of

19  Krukowski & Costello S.C., 7111 West Edgerton Avenue,

20  Milwaukee, Wisconsin on the 3rd day of May, 2011

21  commencing at 1:05 P.M. and *adjourning* at 4:04 P.M.

22

23

24

25

*BEYER REPORTING, INC.   (920) 733-7721*

1                    A P P E A R A N C E S

2

CROSS LAW FIRM, S.C., by
3   Mr. Larry A. Johnson, Attorney at Law
    505 Arcadian Street
4   Waukesha WI  53186
    Appeared on behalf of the Plaintiff.
5
    KRUKOWSKI & COSTELLO, S.C., by
6   Mr. Kevin J. Kinney, Attorneys at Law
    7111 West Edgerton Avenue
7   Milwaukee, WI  53228
    Appeared on behalf of the Defendant.

8

9                          *  *  *  *

10                       I N D E X

11
    EXAMINATION BY:                              PAGE
12  Mr. Kinney                                     3
    Mr. Johnson                                   91
13
                       E X H I B I T S
14
                                             MARKED
15

16
    17 -
17  18 -
    19
18  20
    21
19  22
    23
20

21
    NOTE:  The original exhibits are sealed; copies are
22  attached to copies of transcript.

23

24

25


**BEYER REPORTING, INC.   (920) 733-7721**

T R A N S C R I P T   O F   P R O C E E D I N G S

      APRIL FLEISCHMANN, called as a witness
herein, having been first duly sworn on oath, was
examined and testified as follows:

E X A M I N A T I O N

BY MR. KINNEY:

Q    Good afternoon.  Is it pronounced "fleish-man" or
    "flesh-man"?

A    Fleish-man.

Q    Fleischmann, okay.  Miss Fleischmann, my name is
    Kevin Kinney.  I'm the attorney for Kohler Co. in
    an action which is currently pending in the Federal
    District Court for the Eastern District entitled
    Jennifer Vang, et al, versus Kohler Co.  You are
    not a specific named party in that action, but it
    is my understanding that you have opted into that
    action; is that correct?

A    That's correct.

Q    All right.  Now, have you ever been deposed before?

A    Nope.

Q    All right.  Just as we go through your deposition
    today, this is my opportunity to ask you a series
    of questions regarding information that's relevant
    to this litigation.  Everything that I say,

Case 2:09-cv-00842-WEC   Filed 05/10/11   Page 3 of 98   Document 76-6

1    everything that you say, everything that your

2    attorney, Mr. Johnson, says will be taken down by

3    the court reporter.

4                And I know in the normal world when

5    people talk, they nod their heads up or down, or

6    sideways.  That doesn't work well in deposition

7    because she only takes down what you say; not the

8    gestures that you make.

9                So, if I ask you a question, you know,

10   answer yes or no.  If you don't understand the

11   question, just ask me to repeat it; I certainly

12   will.

13               Also, as we go through the process

14   because she is taking down everything, it's

15   important that even if you know the answer to my

16   question, let me finish my question before you

17   answer it.

18  A  Okay.

19  Q  Sometimes, I change it a little bit or it goes a

20   different direction.  The other thing, too, is to

21   make sure we don't talk over the top of each other

22   because it's very difficult to get a good record if

23   you're talking and I'm talking and Mr. Johnson is

24   talking all at the same time, and we're all going

25   to get yelled at by the court reporter, so --

Case 2:09-cv-00842-WEC  Filed 05/10/11  Page 4 of 98  Document 76-6

```
 1   A    Okay.

 2   Q    All right.  And I always tell people, too, this is

 3        not an endurance exam.  You know, like if you need

 4        a glass of water, if you need to take a restroom

 5        break, all you have to do is just tell us and we'll

 6        find an appropriate spot so we can take a break to

 7        do something like that.

 8              You know, I can't tell you what to do

 9        with respect to your attorney.  Your attorney may

10        occasionally object to a question that I ask.  But

11        I would simply suggest that you let your attorney

12        make his objection before you start to answer.

13        There may be some things that Mr. Johnson and I may

14        need to talk about.  Again, that I cannot instruct

15        you to do, but, you know, I would simply tell you

16        that's not a bad idea to do it that way.

17              MR. JOHNSON:  It wouldn't be a bad idea

18        to listen to your attorney.

19              MR. KINNEY:  Yeah, yeah.  Like I said,

20        but it's up to you.  That I really don't care

21        about.

22              (Discussion held off the record.)

23              MR. KINNEY:  Okay.

24   BY MR. KINNEY:

25   Q    So, we can begin.  You've already been sworn in by
```

```
 1      the court reporter.  Ms. Fleischmann, could you
 2      state your name and spell your last name for the
 3      record?
 4   A  April Fleischmann, F-L-E-I-S-C-H-M-A-N-N.
 5   Q  And do you use a middle name or middle initial?
 6   A  L, Lee.
 7   Q  Lee.  And during the time that you or worked at
 8      Kohler, did you go by any other name?
 9   A  Yes.
10   Q  Okay.  What would that have been?
11   A  April Deuster.
12   Q  How do you spell that?
13   A  D-E-U-S-T-E-R.
14   Q  And was that because of a name change, a marriage,
15      a divorce, all of the above or--
16   A  A marriage.
17   Q  Okay.  So, when you started at Kohler, your last
18      name was Deuster; then you--
19   A  No.
20   Q  No?
21   A  When I started there, I was April Fleischmann.
22   Q  Right.
23   A  I got married, changed it to April Deuster.
24      However, I did not do it legally.  I never finished
25      that process.  And so at some point Kohler Connect
```

*BEYER REPORTING, INC.  (920) 733-7721*

1     said to me, you need to use your legal name.

2           So I was like oh, well, sorry. I meant

3     to change it, but there were complications; so, I

4     didn't. So, they changed it back to April

5     Fleischmann.

6  Q  Okay. So, at least for a period of time in the

7     Kohler administrative records you might be--I might

8     find you under April Deuster?

9  A  That's correct.

10  Q  Okay. You know, why don't you just try to give me

11     the dates as best you can remember on the original

12     name, and the name change, and the change back or

13     whatever it is.

14  A  Okay. Well, I got married in the end of July,

15     2006. So, I would say you August 2006 I was April

16     Deuster.

17  Q  Okay.

18  A  I couldn't tell you when I changed it back. It was

19     probably a year or two.

20  Q  Okay. So, sometime after you got married you

21     told--or shortly after, maybe a month or so, you

22     told the people, you know, change my name to

23     Fleischmann?

24  A  No.

25  Q  Change my name to Deuster?

1  A   Yup.

2  Q   Got it, okay.

3  A   And then they had to change it back to Fleischmann

4       because that is legally my name, and I didn't

5       realize that it was going to cause a complication

6       with them.

7            So, basically they said, well, we can

8       make it April Fleischmann and then parenthesis

9       Deuster if that helps you, which we did, so --

10  Q   Okay.  Okay.  But, your current legal name is?

11  A   April L. Fleischmann.

12  Q   Got it.  So, you have never gone through that

13       process of legally changing your name?

14  A   Yeah.  I like started it, and I said this is a

15       pain.

16  Q   Okay.  Yeah, I don't care why you did or didn't.

17       All right.  Now, are you currently employed?

18  A   No.  I'm unemployed and actually trying to-- I work

19       for myself, kind of I'm trying to get a recruiting

20       business going, so --

21  Q   So, are you currently self-employed, or are you

22       currently in the process of trying to set up a

23       business?

24  A   Well, with unemployment I said I am working as

25       self-employed.  You have to make money to be

Case 2:09-cv-00842-WEC   Filed 05/10/11   Page 8 of 98   Document 76-6

1     employed really, but, I mean, I'm trying. So,

2     that's what I am.

3  Q  Apparently, you're currently collecting

4     unemployment?

5  A  Yes.

6  Q  All right. When did you leave Kohler? I know

7     we've got records here, but --

8  A  Yeah, it was August of 2010.

9  Q  And since August of 2010, have you been employed

10     other than this self-employment?

11  A  No. Except, you know, self-employment, so --

12  Q  Okay. No other position where a person gave you a

13     paycheck at the end of a week or two-week period?

14  A  Nothing.

15  Q  All right, okay. In terms of background, do you

16     have any college degree?

17  A  I have probably about an associates degree.

18  Q  Okay. Where did you--

19  A  But it was not finished. So, I was going for a

20     bachelor.

21  Q  Okay. Where were you going to school at and when?

22  A  Well, it's complicated, but I went to Concordia

23     University in Mequon. I believe I have eight

24     credits there. I went to Marquette University. I

25     don't know how many credits I have there. But then

Case 2:09-cv-00842-WEC Filed 05/10/11 Page 9 of 98 Document 76-6

1    I also went to Colorado Tech, and I have probably

2    48 credits there.

3  Q  When was the last time you were in either a

4    Marquette, Concordia, or Colorado Tech?

5  A  Colorado Tech I was there 2009.

6  Q  Was that while were you employed at Kohler?

7  A  Yes.

8  Q  Okay.  Was that like an online --

9  A  Yes.

10 Q  -- school?

11 A  Yup, absolutely.

12 Q  So, you were not physically located in the state of

13    Colorado?

14 A  Right.

15 Q  Okay.  So, you were taking course online through

16    Colorado Tech?

17 A  That's correct.

18 Q  And then when did you begin your employment at

19    Kohler?

20 A  I believe it was 2004.

21 Q  All right.  And what was your original title?

22 A  Well, I was initially brought in as a temp through

23    manpower.

24 Q  Okay.

25 A  And I worked-- I guess it wasn't an area associate.

1     It was just a --

2  Q  Temp?

3  A  Yeah, temp.

4  Q  And at some point apparently you were hired

5     directly by Kohler?

6  A  That's correct.

7  Q  When was that?

8  A  It would have been 2005, January 10th.

9  Q  1/10, 2005?

10  A  Yup.

11  Q  What was your original title then?

12  A  Area associate one.

13  Q  And what area or department were you assigned to?

14  A  I was in manufacturing support under the kitchen

15     and bath.

16  Q  At that time who was your direct supervisor?

17  A  Scott Berkquist.

18  Q  And how long did you remain in that position in

19     manufacturing kitchen and bath?

20  A  Not quite a year.

21  Q  So --

22  A  I think October of the same year 2005.

23  Q  Okay.  And then where did you go?

24  A  Then I went to David Kohler's office.

25  Q  And did your title or position designation change?

1  A  Yes, I was a senior secretary.

2  Q  Okay.  And was that a position that you had

3     actually applied for?

4  A  Yes.

5  Q  All right.  And what area or department were you

6     now in?

7  A  For David Kohler.

8  Q  Correct?

9  A  That is kitchen and bath executive office.

10 Q  Okay.  So, is it still under manufacturing, if you

11    know.

12 A  Gee, I don't know actually.

13 Q  Okay.

14 A  They called it the executive office, so --

15 Q  And you were a senior secretary reporting directly

16    to David Kohler?

17 A  No, no.  I did not report to David directly.  I

18    reported to Peggy Wesener.

19 Q  And what was Ms. Wesener's position or title?

20 A  She was an administrative assistant.

21 Q  She was your supervisor?

22 A  Um-hum, yes.

23 Q  Do you know if Miss Wesener reported directly to

24    David Kohler?

25 A  Yes, she did.

1  Q   All right.  And how long did you remain in at that
2      position?
3  A   Three years.
4  Q   So, until approximately?
5  A   October of '08.
6  Q   Okay.  And then where did you go?
7  A   I went to, umm, leadership development.
8  Q   What was your title?
9  A   Same--senior secretary.
10 Q   Who did you report to in the leadership development
11     position?
12 A   Laura Nigbur.
13 Q   Can you spell--
14 A   N-I-G-B-U-R.
15 Q   And how long did you stay in that position?
16 A   I believe-- There's a-- Within a month I probably
17     had four bosses.
18 Q   Yeah, I'm not--
19 A   And I'm just going to tell you I don't know the
20     exact date of the changes.
21 Q   That's fine.
22 A   But it was all basically in that learning,
23     leadership development kind of group.
24 Q   Okay.
25 A   In HR.  I considered it corporate HR, so --

1  Q  And approximately how long did you stay there

2     though?

3  A  Probably approximately a year.

4  Q  Okay.  So, until about the fall of 2009?

5  A  Yup, um-hum.

6  Q  Okay.  Then where did you go?

7  A  Well, in between there they moved me from Laura to

8     Mike Grubich.

9  Q  You changed supervisors?

10 A  Right.

11 Q  Okay.  But you still stayed within what you

12    considered to be leadership development or

13    corporate HR?

14 A  Corporate HR, right.

15 Q  Gotcha.  The person you reported to directly to may

16    have changed --

17 A  Right.

18 Q  -- perhaps several times during this period?

19 A  Yeah.  It was Mike Grubich.  Then it was Doug

20    Dillon.  And then it was Peggy Lemkuil, and then it

21    was Tanya Luloff.

22 Q  Okay.

23 A  So, it was just kind of they made all those

24    decisions.  I didn't have any input on that.

25 Q  So, for example, did your title change?

1   A   No.

2   Q   So, you were a senior secretary with each one of

3       those individuals?

4   A   Um-hum, yes.

5   Q   Tanya Lulloff was your last supervisor in corporate

6       HR; is that right?

7   A   Yes.

8   Q   Did you go anywhere after that?

9   A   No.

10  Q   Stayed there until the end of your employment?

11  A   Um-hum, yes.

12  Q   Okay.  And then, again, I think we may have

13      established it, but when did your employment end?

14  A   That would have been in October or--excuse

15      me--August of 2010.

16  Q   Okay.  And do you know why your employment ended?

17  A   I-- Yes, sort of.

18  Q   Okay.

19  A   It was kind of a mutual agreement.

20  Q   Okay.  Mutual-- Let me start this way.  Were you

21      part of a, I'll call it, a general organizational

22      downsizing that was going on as a result of the

23      difficulties within the --

24  A   Industry.

25  Q   -- industry?

1   A   That played a part in it, I'm sure.

2   Q   Okay.  Because certainly during this 2008, 2009,

3       2010 there were very significant and very obvious

4       corporate-wide layoffs of personnel, correct?

5   A   Correct, and reorganizations, so.

6   Q   Right, right.  But with respect to your particular

7       circumstances there were some other circumstances

8       that also played into it in terms of--

9   A   Correct.

10  Q   Okay.  And what would you attribute, at least your

11      part of the decision to leave, to be?

12  A   Health.  Health reasons, I guess, really.  Mental.

13  Q   Your personal health reasons?

14  A   Yes.

15  Q   Stress?

16  A   Very high, high stress.

17  Q   Okay.  And at that some point in time it's my

18      understanding that you were missing a lot of work,

19      I guess, would that be accurate, or --

20  A   Well, how I would put it is that I-- I mean, I'm at

21      an age where I'm going through menopause.  And so I

22      don't want this on public record really, but --

23  Q   It is.

24  A   -- you know, I had heavy flow, and sometimes it was

25      terrible enough that I said, let me work from home.

*BEYER REPORTING, INC.   (920) 733-7721*

```
 1       So, they did in some cases.  And in some cases they
 2       said just--you're sick, you're sick.
 3  Q    Um-hum.
 4  A    And so, I mean, it wasn't something I could help.
 5  Q    Right.  I understand.  But at some point in time it
 6       reached a point though where between the things
 7       going on in your personal life and Kohler's
 8       expectation that, for lack of a better word, a
 9       decision was made mutually to end the relationship?
10  A    I will clarify that it had nothing to with my
11       attendance or my work output.  So, I mean, I just
12       don't want it to be a misunderstood.  I was doing
13       my job, and --
14  Q    Yeah, that's not my question.  My question though
15       is:  Given what was going on in your personal
16       life--not your work life--that ultimately a
17       decision was mutually reached between you and
18       people at Kohler to end the employment
19       relationship?
20  A    I don't believe that it had nothing to do with my
21       personal life or at least nobody ever told me that
22       it was.
23  Q    Here, let me start over.  You told me that it was a
24       mutual decision?
25  A    Right.
```

1  Q  Okay.  So, that implies that you and the company

2      collectively agreed that it would be better for you

3      not to be there?

4  A  Right.

5  Q  Okay.  And my question to you is:  What were the

6      things that caused you to decide that it would be

7      better for you not to be there?

8  A  I mean, the answer has got so many variations.  I

9      mean, the fact is I was overworked.  And the stress

10     was becoming more than it was worth.

11          And I felt that the company was

12     interested in having me leave.  I didn't really

13     understand why, but there were indications to me

14     that that would have been preferred and that they

15     might be pushing me toward quitting.

16          And I said-- I went to one of the

17     corporate attorneys and said, you know what?  This

18     is as much as I want to take.  So, can we just

19     mutually agree to let me go.

20  Q  And they agreed?

21  A  And they agreed, correct.

22  Q  All right.  Okay.  And if I'm not mistaken, you

23      ended up getting some severance and signing off on

24      a release and waiver document, right?

25  A  Yes.

```
1    Q    Okay.  Now, you have opted to join this litigation
2         which specifically addresses an issue as to whether
3         people were improperly denied payment for hours
4         worked.  You understand that at least generally,
5         right?
6    A    Right, um-hum, correct.
7    Q    When you started at Kohler, were they doing paper
8         time-keeping, or had Workbrain already gone live?
9    A    I don't recall there being anything about
10        Workbrain.
11   Q    And, again, I'm not talking about your period of
12        employment as a temporary employee through
13        Manpower.
14   A    Right.
15   Q    I'm only talking about your employment starting in
16        January of 2005 as a Kohler employee.
17   A    Right.
18   Q    Okay.
19   A    As a Kohler employee, I don't recall there being
20        anything but Workbrain.
21   Q    Got it, okay.  And when you began as a Kohler
22        employee, who, if anyone, instructed you on how to
23        fill out, complete your time-slips on Workbrain?
24   A    I believe the of girl that left my position showed
25        me Workbrain, and said it pretty much is ready to
```

```
1        go.  Because the job that I was doing was not a big
2        overtime kind of job.
3    Q   Um-hum.
4    A   So, she just told me how to do it.  And, basically,
5        it was just a matter of submit, you know, so --
6    Q   Okay.  And do you remember though ever going to
7        like, I'll call it, more of a formalized class
8        perhaps like in the Learning Center where
9        individuals from human resources or payroll would
10       have done an instruction or a tutorial on
11       Workbrain?
12   A   Not that I recall.
13   Q   Okay.  You got a copy of the Kohler handbook when
14       you joined the company, right?
15   A   Correct.
16   Q   Okay.  Did you review that handbook at least
17       generally when you started generally?
18   A   Yeah.  I did have a Kohler integration class.  And
19       my understanding-- We basically went through the
20       book, so --
21   Q   Okay.
22   A   They did not show you the program per say, but just
23       told you about it.
24   Q   Okay.  And in that Kohler integration class, at
25       least one of the components was in terms of how you
```

```
 1        fill out your time-slips, right?
 2     A  I don't believe so.  The majority of the people in
 3        the class were not people that would fill out
 4        time-slips.
 5     Q  Okay.
 6     A  So, I was in a class amongst chefs and
 7        executives --
 8     Q  Oh.
 9     A  -- and, so it was kind of a generalized training.
10     Q  Okay.  Do you remember who facilitated or taught
11        your class?
12     A  Yes, Shirley Newcome.
13     Q  Okay.  An hour, four hours, full day--how long did
14        that last?
15     A  Oh, umm, maybe four hours.
16     Q  Okay.  And you understood that Kohler did not pay
17        overtime for people that worked after more than
18        eight hours in a day, correct?
19     A  Pardon.
20     Q  That Kohler did not pay overtime if you worked more
21        than eight hours in a day?
22     A  Umm, I did not know that.  I was told that at one
23        point though.
24     Q  Okay.  At some point in time you did understand
25        though that Kohler did not pay overtime after eight
```

```
 1        in a day.  They only paid overtime after you worked
 2        more than 40 hours in a week, correct?
 3    A   Correct.  And I think I gave you one of the e-mails
 4        that indicated that to me because I wasn't aware of
 5        it.
 6    Q   Right.  Because it's my understanding that you were
 7        inquiring as to why you did not get overtime for
 8        the days where you worked more than eight hours?
 9    A   That's correct.
10    Q   Okay.  And the individual that responded said,
11        because we don't pay after eight hours.  We only
12        pay after 40?
13    A   Correct.
14    Q   Okay.  Did you verify that with any of your
15        coworkers?
16    A   I don't recall.
17    Q   Okay.  Tell me how you would fill out your
18        Workbrain time-slip?  What was your practice?
19    A   My practice varied depending on--
20    Q   Let's start, and then we're going to have to start
21        in manufacturing with your kitchen and bath job
22        with Scott Berwinski?
23    A   Bergquist.
24    Q   Bergquist, okay.
25    A   Basically, I just every week went into the website,
```

Case 2:09-cv-00842-WEC  Filed 05/10/11  Page 22 of 98  Document 76-6

1      pushed submit.  It was very easy.  I didn't work
2      overtime, so--
3   Q  Okay.  And what were your hours of work in that
4      position?
5   A  Seven-thirty to 4:30 P.M. and I took one hour for
6      lunch, so --
7   Q  Okay.  And you would submit it electronically to
8      Mr. Bergquist?
9   A  That's correct.  I would submit it.  It really
10     didn't tell me where it was going, but I knew that
11     he was getting it.
12  Q  Okay.  And at least to your knowledge did he ever
13     change the slip that you submitted?
14  A  Not to my knowledge.
15  Q  Okay.  And again, to your knowledge, did anyone in
16     payroll ever change the ship that you had
17     submitted?
18  A  While I was in that role, no.
19  Q  Yeah.  I'm going to try to go through them
20     sequentially, so --
21  A  I don't believe so.
22  Q  I know you said you just hit submit.  But, for
23     example, if you missed a day of work because of a
24     vacation, or a holiday, or a sickness, you would
25     have to code that in differently than if you worked

1    a regular day though, correct?

2  A  That's correct.

3  Q  So, you would manually make those --

4  A  Changes.

5  Q  -- electronic changes?

6  A  That's correct.

7  Q  Okay.  After you moved into the next position in

8     October of 2005--kitchen and bath in the executive

9     area--how, if in any way, did the way you filled

10    out your time change?

11 A  Well, almost predominantly I had overtime every

12    week.  So, I always would put in that, and you

13    know, same with the sick days and that sort of

14    thing.

15 Q  So, you would --

16 A  Vacation time.

17 Q  Right, right.  Now, would you record the number of

18    hours that you worked in a day?  Like on a Monday,

19    Let's say that you worked 9.5 hours.  Is that what

20    you would put in your slip?

21 A  Yes.  I want to just clarify that.  When I was

22    first in the role, that was--overtime was no

23    problem.  So, you know, yeah, I would just put it

24    in that --

25 Q  Whatever you worked?

```
 1   A   Yeah, yeah.
 2   Q   Okay.  And same thing--if you had a vacation day or
 3       a sick day or a holiday, you would note it
 4       accordingly?
 5   A   Correct.
 6   Q   And then you would submit your time slip, right?
 7   A   Correct.
 8   Q   Did you fill yours out on a daily basis, or did you
 9       fill it out on an every other day, or a weekly
10       basis?  How often did you do it?
11   A   I had initially because of not being used to the
12       overtime, I would put it in the format, you know,
13       online.  And then it would just keep it.  Then if I
14       would go there the next day, and-- But, umm--
15   Q   No, I don't know.
16   A   Okay.  So, I would do it daily at first.
17   Q   Okay.
18   A   But it became too time-consuming, and I needed my
19       time for other things.  So, I just started putting
20       it right in my calendar.
21               At the end of the day I would just say,
22       okay, worked through lunch, you know, so I would
23       put eight plus one, no lunch.  And then plus three
24       if I stayed over--you know what I mean?  So, I
25       started keeping track of it in my calendar.
```

```
1    Q    And I assume when you say "my calendar," you mean

2         like a paper calendar?

3    A    No, electronic calendar.

4    Q    Okay.  Is there a document that you have produced

5         here today that is your electronic calendar?

6    A    No, no.  I did not have that.

7                   MR. JOHNSON:  Might be a good chance to

8         take a quick five-minute break?

9                   MR. KINNEY:  Yeah.

10                  (Whereupon, a recess was taken.)

11                  MR. KINNEY:  Back on the record.  We

12        took a short break.  Counsel has produced a very

13        large computer file and we're trying to figure out

14        how is the best way to proceed given what we see

15        there.

16                  Right now they're upstairs trying to

17        take a screen-shot of the files.  Many of them

18        appear to be unrelated to this litigation.  And

19        we'll figure out one way or another to take a break

20        and figure out what we need to do and some way get

21        it downloaded too.  All right.

22   BY MR. KINNEY:

23   Q    I think I was still --

24                  MR. JOHNSON:  We were talking about the

25        calendar.
```

1           MR. KINNEY:  Right.

2    BY MR. KINNEY:

3    Q   Right.  I was asking you a question about your

4        calendar that you had previously referred to.  And

5        it is my understanding that the calendar, for

6        whatever reason, does not--or you have not been

7        able to locate it on the electronic file that your

8        counsel just produced?

9    A   That's correct.

10   Q   Do you have any memory of deleting that calendar?

11   A   No.  No way I would.  That had, basically all of

12       this information (gesturing) initially came from my

13       calendar.  I would put it in the calendar.  And

14       then I would cut and paste it into this

15       spreadsheet.

16               And then next day I would--  It was

17       faster to do it on the calendar.  And then

18       sometimes I would do two days in a row, here, on

19       this spreadsheet.

20               And the calendar is something that

21       followed me wherever I was at Kohler.  So, I had my

22       records going all the way back to the beginning of

23       my time there.  So, I don't-- I can't fathom why it

24       wasn't a part of-- I mean, because I-- I know that

25       the calendar followed me everywhere I went at

1      Kohler.

2  Q   Well, the documents that your attorney just gave to

3      me --

4  A   Yup.

5  Q   -- in electronic format--how did those documents

6      come to be in your possession after the end of your

7      employment with Kohler?

8  A   Well, they were in my possession beforehand

9      apparently because I didn't realize-- I didn't

10     remember that I had them.  And I was going

11     through-- I had a computer crash, and so I

12     basically was trying to reinstall my files, okay.

13             And at some point while I was doing

14     that, I realized that I had all of my Kohler stuff

15     in there.  Now, it wouldn't have been until I left

16     Kohler, but it would have been the last time that I

17     did a backup.

18             So, you know, I didn't even see--

19     Actually, I didn't notice when it was.  But you

20     could probably tell based on the calendar maybe

21     or-- Well, the calendar wasn't there.  Umm, well,

22     the latest file date.

23 Q   Well, did you still have your calendar on the last

24     day that you were at Kohler?

25 A   On my Kohler computer, yes.

```
1    Q    Okay.

2    A    And that's, you know, that's what I'm saying.

3    Q    How did all of this data end up on your home

4         computer?

5    A    It wasn't.  It was on that hard drive, the blue

6         hard drive I gave you.

7    Q    Oh, I didn't see a blue hard drive.  Where did you

8         get the blue hard drive from?

9    A    I bought it.  I bought it to do backups of my home

10        computers, and I brought it into work and backed up

11        my files at work, so.

12                   I did it periodically.  Like, I know

13        there is something in there from 2004, 2005, 2008

14        like that.  Oh, and March of 2010--that must have

15        been the last time I updated it--March 26 of 2010.

16   Q    And what did you--

17                   MR. KINNEY:  We're going to go off the

18        record.

19                   (Whereupon a discussion was held off

20        the record.)

21                   (Whereupon exhibit 17 was marked for

22        identification.)

23   BY MR. KINNEY:

24   Q    Okay.  Miss Fleischmann, I have handed you a

25        document that we have mashed as exhibit 17.  Could
```

1       you tell me what I'm looking at?  It is a

2       seven-page document.

3  A  This is a snapshot of all of the folder names in my

4       backup files.

5  Q  And when it says-- Do you see the address line

6       where it says "hi back slash for Kevin?"

7  A  It says, "H colon back slash for Kevin," and that's

8       because it came off of his H-drive.

9  Q  And who is "him"?

10  A  Kevin--  I mean, Larry's hard drive.  And he was

11       saying that is for you.

12  Q  Okay.  And how did Mr. Johnson--how did Larry get

13       this information?

14  A  It came off of my external hard drive.  And I gave

15       it to him to copy the files.

16  Q  Okay.  And the information that is on exhibit

17       17--how did it get on your external hard drive?

18  A  I put it there.

19  Q  Okay.  And how were you able to do that?

20  A  Well, periodically I had backed up my files just to

21       make sure that if ever the computer crashed, that I

22       had a backup of the files.

23             A lot of the presentations I worked on

24       were huge, and I did not want to lose what I had

25       done with them, so-- And kind of when you're in an

Case 2:09-cv-00842-WEC  Filed 05/10/11  Page 30 of 98  Document 76-6

```
 1       executive role, you tend to be very careful about

 2       making sure that no matter what happens, you're

 3       prepared.

 4    Q  Why would you back them up-- Why wouldn't you back

 5       them up on the Kohler system?

 6    A  Umm, a lot of them were backed up on the Kohler

 7       system.

 8    Q  Why would you go out and buy your own hard drive

 9       and back them up?

10    A  Well, I had the hard drive for my computers, and

11       each time I changed jobs, I would take the files

12       with me.  I had experience losing them at the

13       Kohler Company.  So, you just learn to be cautious.

14       That's all.

15              These are all-- This is my work.  It's

16       stuff that I did.  And I didn't want to lose it.

17    Q  You understand that this is not your property?

18    A  I wasn't giving it to anybody, but he said I should

19       give it to you.

20    Q  Yeah, I understand that.  Okay.  All right.  Let's

21       go back to October of 2005 when you moved into

22       kitchen and bath in the executive area reporting to

23       Peggy Wisnewski?

24    A  Wesener.

25    Q  Wesener, all right.  And again, my understanding is
```

1   what you would do is you would typically record the

2   hours that you worked in your calendar?

3 A Correct.

4 Q And then at some point during the week you would

5   then go into Workbrain and you would enter that

6   information; is that right?

7 A That's correct.

8 Q Okay.  And then you would submit your Workbrain

9   time-slip, right?

10 A That's correct.

11 Q And it would go to Peggy?

12 A That's right.

13 Q To your knowledge, did Peggy ever go into your

14   Workbrain slip and change any of the time at you

15   had submitted?

16 A I'm not positive, but I believe one of those

17   e-mails indicates that, yes, she has.

18 Q Okay.  And did she tell you why?

19 A I believe the e-mail would have indicated that.

20 Q Okay.  Other than that one time are you aware of

21   Peggy changing any of your time-slips?

22 A There might have been another time.  And, again, it

23   would be in an e-mail.  I know there were a couple

24   of e-mails talking about my hours and how they were

25   recorded.

1    Q   Okay.  All right.  I'm going to ask you not to look

2        at any documents unless I put them in front of you

3        during your deposition, okay.  Let's mark this.

4                (Whereupon exhibit 18 was marked for

5        identification.)

6  BY MR. KINNEY:

7    Q   I'm going to show you--and again, the reason I

8        picked this one is because it does happen to

9        reference Peggy, all right.

10              Now, if you look at exhibit 18 there's

11      a "re" line at the top that would indicate that

12      this document was generated in May, actually

13      May 2nd of 2011.  Obviously, that was long after

14      your employment with Kohler had ended, correct?

15    A   Yeah.  This was--

16    Q   The date on the top box refers to the date that it

17        was printed as opposed to when it was generated?

18    A   That's correct.

19    Q   And with respect to this series of e-mails, which

20        are reproduced on three sheets, if we wanted to

21        read them sequentially, we'd have to start in the

22        back and read forward then, correct?

23    A   That's correct.

24    Q   So, we'd go to the third page, right?

25    A   Yup.

1  Q   Okay. Now, the first message that I see appears to

2       have been generated in December of 2006, and it

3       came from Sandy Herzog in corporate payroll

4       basically informing you, with a copy to your

5       manager, that you forgot to do your time-slip that

6       week?

7  A   That's correct.

8  Q   All right. And then you got that message on

9       apparently on Tuesday, January 2nd and you

10      responded, "Happy New Year. I was swapped. I

11      forgot to do the time sheet." And then you ask a

12      question, "What should I expect?" Is that right?

13  A   Right.

14  Q   Okay. And then Ms. Herzog in payroll told you

15      "Since it was not touched and I have no way of

16      finding out, I could not process," meaning she

17      couldn't process the payroll, right?

18  A   Right, um-hum.

19  Q   Okay. And then she said, "Give me the hours you

20      worked that week and I will have to enter them

21      manually. Checks are already printed."

22  A   Correct.

23  Q   Okay. And did you understand what she meant by

24      that?

25  A   Yes, yes. I half expected I wouldn't get a check

1    until then the following check series or whatever,

2    so--

3  Q  Okay. But Ms. Herzog apparently had the ability to

4    either get back into the system or maybe do a

5    manual check, or do something like that?

6  A  That's correct. And, I mean, they don't like to

7    but they definitely can.

8  Q  Right. But she needed your hours in order to do

9    it?

10  A  Correct.

11  Q  Okay. And then you wrote back to her and said,

12    "Peggy told me to just add the OT hours to this

13    week's time sheet. Is that okay?"

14         Okay. And I'm assuming what you are

15    now saying is, well, I had some overtime that week.

16    Should I just put them on this week's slip?

17  A  Right.

18  Q  Okay. And Miss. Herzog writes to you and says,

19    "You do not understand. You do not even get the 40

20    hours and you should put on the correct days." You

21    understand what she means by that?

22  A  She was saying the overtime needed to be recorded

23    on the correct days.

24  Q  Right.

25  A  So, and I was going to do that, but Peggy said just

```
 1        put it on this week, and just leave it, so --
 2   Q    Okay, okay.  And then you then submitted it, okay?
 3   A    Um-hum.
 4   Q    And you said, "Okay, thanks.  I worked a total of
 5        35.5 hours," and you reported that?
 6   A    Um-hum.
 7   Q    And it turns out that you actually didn't have any
 8        overtime for that week, correct?
 9   A    Umm, I don't know what the 21st was.  But yes, I
10        did not work.  But I think what I thought is if it
11        was a sick day, and I took eight hours of sick
12        time, and if you put an eight there, I mean it's
13        not actual time I worked.
14              I didn't understand that that's how
15        Kohler did it at the time.  So, this is when I
16        learned of it.
17              I just assumed that the days that I
18        worked nine or nine and a half hours--that I would
19        get an hour, or an hour and a half of overtime.
20              But she said no, no you have to
21        actually physically work.  It doesn't matter if you
22        take vacation or sick time or anything.
23   Q    Okay.  And as a matter of fact, she explained
24        saying, "There are no overtime hours, meaning there
25        are no overtime hours on that week.  We only pay
```

```
 1        overtime over 40 hours a week, not eight hours a
 2        day."
 3   A    Right.
 4   Q    Okay.
 5   A    So, I'm like, okay.
 6   Q    Oh, okay.
 7   A    But--and then that just, I gave you a copy of that
 8        because I thought it would be good for you to
 9        understand that that was when I learned that that
10        is how it is.
11   Q    Okay.
12                    (Whereupon exhibit 19 was marked for
13        identification.)
14                    MR. KINNEY:  Can we go off the record
15        real quick?
16                    (Whereupon a discussion was held off
17        the record.)
18   BY MR. KINNEY:
19   Q    The document that we're looking at, exhibit 19
20        which is Bates stamped 374--was an e-mail that was
21        generated by you in March of 2006.  It's to Peggy
22        Wesener.  And it refers to an e-mail that
23        apparently she sent a few months ago.  And you ask,
24        or you made a statement, "I never know if you don't
25        want to pay for overtime, or if you simply want me
```

```
 1        consistently working from eight to five."  That's
 2        the only reason I ask you about it today, okay.
 3        And Peggy responds to you saying, "I signed your
 4        time ticket last week," or is --
 5   A    That's her initial e-mail, the old one, from
 6        January.
 7   Q    Got it, okay.
 8   A    2006.
 9   Q    Okay.  So, you're responding --
10   A    I copied that, and I said, you know, I'm just
11        saying it's mixed messages here.  I don't know if
12        you don't want me to work overtime because you
13        don't want to pay for overtime, or if it's that you
14        just want me here eight to five.
15                 I think a situation happened where I
16        took Friday off because I had overtime hours.  And
17        she was upset about it.  And I'm like, well, you
18        know, honesty it doesn't seem to matter what I do.
19        You're going to have an issue one way or another.
20        I need to have it clear.
21   Q    Okay.  But Miss Fleischmann, what I am
22        understanding what you're saying, though, is at the
23        time that you wrote this e-mail which is exhibit
24        19, you were under the impression that you got
25        overtime, meaning time-and-a-half, any time that
```

```
 1        you worked more than eight hours in a day?
 2   A    No.  Isn't that in January 2006?
 3   Q    No, 2007.
 4   A    Oh, okay.  That's possible.
 5   Q    Okay.
 6   A    But --
 7   Q    So, you were under the impression that you got
 8        overtime if you worked more than eight hours in a
 9        day.  You were also under the impression that you
10        got overtime that was based on vacation, or
11        holidays, or sick pay, right?
12   A    Okay.  Here's the difference.
13   Q    No.  Just answer my question.
14   A    Okay.  I did not realize that their system only
15        paid overtime per week okay.
16   Q    So, so when you just told me that apparently Peggy
17        had gotten upset with you for taking off a Friday
18        because you had overtime, that overtime was based
19        on your misconception as to how Kohler paid
20        overtime, correct?
21   A    True, true.
22   Q    Okay.  And, again, when I'm looking at the memo or
23        the e-mail that Miss Wesener sent to you, she told
24        you you should only be working overtime if you have
25        a project for David or someone else in the group
```

1      that needs to be completed, right?

2   A  Right.

3   Q  She told you you should be working from eight to

4      five.

5   A  Yup.

6   Q  And she also told you that she noticed that you had

7      overtime, meaning more than 40 hours, on your

8      time-slip for the previous week and she approved

9      it, right?

10  A  Right.  And it hadn't been a problem up until that

11     point.

12  Q  There's no question before you.  I don't-- Why

13     don't we mark Bates 376 as exhibit 20.

14              (Whereupon exhibit 20 was marked for

15     identification.)

16  BY MR. KINNEY:

17  Q  I'm looking at another document that you produced

18     which is a series of e-mails in August of 2006.

19     You had actually written an e-mail to Sandy Herzog

20     in payroll, I'll say, you know, pointing out to her

21     that you believe your paycheck was off because it

22     only showed one hour of overtime and you thought

23     you had five hours coming, correct?

24  A  That looks correct to me.

25  Q  All right.  And then Ms. Herzog responded that

```
 1        overtime is paid over 40, not eight in a day.  And
 2        that sick time, jury duty, bereavement does not
 3        count toward the 40 hours, right?
 4    A   Something new in the mix, umm.
 5    Q   Now, do you believe that you have not been paid for
 6        the hours that you worked?
 7    A   Yes.
 8    Q   Okay.  Can you tell me an hour that you worked that
 9        you were not paid for?
10    A   Yes.
11    Q   Okay.  When?
12    A   Amongst many --
13    Q   I just need one right now.
14    A   -- but I'll give you one.
15    Q   Let's start with one.
16    A   With David Kohler's annual Christmas party that he
17        gave, I set the entire thing up.  I was also
18        required to be at the party and working at the
19        party.  I was responsible for its smooth setup and
20        take-down--the whole thing.  Umm, never did I get
21        paid for being there.  There's one.
22    Q   Okay.  So, that would have been sometime in 2005 or
23        2006; is that right?
24    A   I did it every year--2005, 2006, 2007.  I did not
25        go to the 2008.
```

1    Q    Okay. So, in December of 2007 you attended the

2        Christmas party?

3    A    As an a responsible party.

4    Q    Well, who was invited to the Christmas party?

5    A    Everybody in kitchen and bath.

6    Q    Okay. Including yourself?

7    A    Including myself. I didn't receive an invitation.

8        I made the invitations, so --

9    Q    Were you in kitchen and bath?

10   A    Yes.

11   Q    Okay. Did you have anything to eat at the party?

12   A    Yes.

13   Q    Okay. How long did the party last?

14   A    I basically was there from seven-- People would

15       start coming about seven-thirty, eight. I was

16       there until after midnight.

17   Q    Okay. And where was it held?

18   A    Various locations. But mostly at the John Kohler,

19       John Michael Kohler Art Center.

20   Q    Okay. And why weren't you paid for the Christmas

21       party?

22   A    We weren't allowed to put in for overtime. So,

23       it's not like Peggy said, oh, you know, don't come

24       in until late Monday or something. Never. My work

25       was still supposed to be done.

1   Q   All right. You just made a comment, "We weren't

2        supposed to put in for overtime." I've looked at

3        all of the documents that you've provided to me

4        today, and I don't see any document that says

5        you're not allowed to put in for overtime.

6   A   Well, these are just documents. Peggy sat six feet

7        from me, so she talked to me a lot and told me that

8        the entire department has to cut out overtime.

9        That's me, too.

10   Q   Okay.

11   A   And honestly, I was okay with that. I thought it's

12        not a big deal. I like my job. I enjoy working

13        for this company. I'm loyal to them, and I'll do

14        whatever it takes to get my job done and do it

15        well. So, that was never an issue.

16              I accepted that situation. Now, there

17        were occasions when I knew it was going to be

18        extraordinary and said, you know, it's okay that

19        I'm doing overtime for this, right? And, yes, in

20        most cases. Because I did not ask a lot.

21              Early, when I first started in David's

22        office, there was no issue about the overtime. I

23        worked much fewer overtime hours than my

24        predecessor.

25              But there was never any issue given to

1       me about working overtime until Peggy started, and

2       it kind of started a rough spot for us, which is

3       part of the reason I started recording my hours

4       because I didn't like that she started hassling me

5       about the overtime.

6                   They did not say, well, you don't have

7       to do this portion of your job, so it's, you know,

8       you shouldn't need overtime.

9                   I had to do the same amount of work,

10      and in a high profile job like that, you're

11      required to have your job done or you will reflect

12      on that entire office.  It's not just me.

13   Q  Well, you keep pointing at the documents that we

14      have marked as exhibits.  And what I'm reading from

15      Peggy's e-mail to you is that you should only be

16      working overtime if you have a project for David or

17      someone else in the group that needs to be

18      completed.  You need to meet deadlines.  Working on

19      Power Point print (listen) need to be completed,"

20      okay?

21   A  Yup.

22   Q  And she told you you should be working from eight

23      to five Monday through Friday, right?

24   A  Yup.  I mean, what did she think I was there for on

25      the overtime?  I was working.  I was doing

```
 1        something that needed to be completed.  And so her
 2        e-mail to me was kind of surprising.
 3   Q    Okay.  What I'm-- You filled out Workbrain, right?
 4   A    Correct.
 5   Q    Okay.  What time did you come in in the morning?
 6   A    It varied.
 7   Q    From?
 8   A    Anywhere from six, six-thirty in the morning until
 9        sometimes it would be eight o'clock.
10   Q    Okay.  And what time did Peggy come in?
11   A    Eight o'clock.
12   Q    Okay.  Or her start varied, too, right?  Sometimes
13        it was even later than eight o'clock?
14   A    I don't know about that.  I mean, I remember her
15        being pretty eight to five.
16   Q    Okay.  What time did you leave at the end of the
17        day generally?
18   A    Anywhere from five until nine o'clock at night.
19   Q    But you're telling me that Peggy got there at
20        eight, and she left by five, right?
21   A    There were maybe a few times where she came in
22        early or stayed a little later.  But for the most
23        part, like I said, she was fairly regular.
24   Q    Okay.  And then you would fill out your Workbrain
25        time-slip approximately once a week, right?
```

*BEYER REPORTING, INC.   (920) 733-7721*

```
1   A   Correct.
2   Q   Then you would submit it to Peggy?
3   A   Right.
4   Q   And I think you indicated that maybe twice there
5       was a time that you think she changed it; is that
6       right.
7   A   That's right.
8   Q   And I believe you referenced or when you told me
9       that, you pointed at a document which, again,
10      indicated to me that there must have been something
11      in one of the documents you gave me today saying
12      that she had changed it; is that right?
13  A   There was an e-mail.  I thought I had given that.
14  Q   Well, I'm going to show you the three e-mails that
15      I've got which are exhibits 18, 19 and 20.
16  A   Okay.
17  Q   Can you show me the e-mail that you believe
18      reflects that Peggy changed your time?
19  A   Maybe I just perceived that she changed it because
20      it looked like one hour of overtime instead of what
21      I had put was five.
22  Q   Okay.  So, now in reviewing the documents that you
23      have produced, even to you it does not appear that
24      she changed your Workbrain entry?
25  A   Hold on one sec.
```

```
 1   Q   Please, look at all of them.
 2   A   There was one situation.  Umm, this isn't the
 3       e-mail that I'm thinking of.  It would be in that
 4       system that you had.
 5               Now, I didn't know I had this until
 6       just two days ago, three days ago maybe.  So, what
 7       I had gathered was kind of suddenly.  So, the only
 8       thing I had that I was aware of is this spreadsheet
 9       and the e-mails that my husband was involved in.
10               So, but I had been then after talking
11       with Larry going through the files.  And, umm, I
12       mean, I'm willing to say that that's the case--that
13       Peggy did not change anything.
14               I believe there's one e-mail that
15       indicates that she did, and it was because-- It
16       wasn't--maybe it wasn't Peggy.  It might have been
17       Sandra Herzog just giving me 40 hours.
18               You know what?  I looked through so
19       many files.  I would have to see it again.  I would
20       just have to pull it up.
21               I believe what I did is went into the
22       went into the actual e-mail file and I typed in
23       "overtime" as a search word, and it pulled up a
24       number of e-mails.  And so I did do that.  And I
25       found some that were kind of like oh, you know, I
```

Case 2:09-cv-00842-WEC  Filed 05/10/11  Page 47 of 98  Document 76-6

```
 1        should bring this up.
 2                    And then when he said, you know, to
 3        just bring it, then I just left it--
 4                    MR. JOHNSON:  Could you just keep the
 5        conversations between you and I--those are
 6        confidential.
 7                    THE WITNESS:  Okay, sorry.
 8                    MR. KINNEY:  I'm not going to ask about
 9        them.
10   BY MR. KINNEY:
11   Q    Okay.  If you look at what we've marked as exhibit
12        17, could you tell me the file that you're
13        referring to that you found these or that you did
14        the search on where you used the word overtime or
15        OT?
16   A    Yes.
17   Q    Okay.
18   A    It's in the Outlook file.
19   Q    Okay.  And at least as far as you saw, was it in
20        any other file?
21   A    No.
22   Q    So, if I go to the Outlook file, whatever e-mails
23        there might be, they would be there?
24   A    Yeah.  I either-- I did two searches.  One was
25        overtime, and one was hours.
```

```
 1  Q   And you did you only do the search in the Outlook
 2      file?
 3  A   Well, the Outlook folder contains five or six
 4      files.
 5  Q   Okay.
 6  A   They have to be brought up from Microsoft Outlook.
 7  Q   Right.
 8  A   So, you go into Outlook.  You say file, open, open
 9      Outlook data file.
10  Q   Right.
11  A   And then I went and browsed to this folder.
12  Q   Right.
13  A   And opened it up.  And then I did searches.
14  Q   Okay.  On all five of them?
15  A   No.  I only opened--because I believe that there
16      was one in there that was not relevant at all.  And
17      there was one that was so small I didn't think it
18      would be anything pertinent, but --
19  Q   Okay.
20  A   What I searched was while I worked in David's
21      office because I did remember that Peggy and I had
22      a couple of conversations that were--we did not
23      agree on how it should have been.
24  Q   When you said you worked in David's office, just so
25      I'm clear, when you moved into leadership
```

*BEYER REPORTING, INC.   (920) 733-7721*

```
 1        development, did that mean that you left David's

 2        office?

 3   A    Completely, yes.

 4   Q    Okay.  So, as of October of 2008, you're out of

 5        David's office and you're no longer reporting to

 6        Peggy?

 7   A    That's correct.

 8   Q    Okay.  Now, we haven't marked this document yet.  I

 9        guess we might as well.

10                   (Deposition Exhibit No. 21 was marked

11        for identification.)

12   BY MR. KINNEY:

13   Q    I have marked a document as exhibit 21.  Can you

14        tell me generically just what I'm looking at?

15   A    It is a spreadsheet of my daily output, including

16        hours worked.

17   Q    When did you prepare this document?

18   A    Each day--or sometimes I would wait a couple

19        days--but I basically filled it in every day on my

20        calendar.  And then I would paste--each day I would

21        just take (gesturing ) and plop it in here.  And--

22   Q    And if I am reading this document correctly, it

23        would appear to cover the time period of

24        February 15 of 2010 until April 16 of 2010; is that

25        correct?
```

```
 1   A    April?  Nope.  It should have been through August.

 2                    MR. JOHNSON:  Can we go off the record

 3         for just one second?

 4                    (Whereupon a discussion was held off

 5         the record.)

 6                    MR. KINNEY:  Now, we're going to go

 7         back on the record, and I have one question for

 8         you.

 9   BY MR. KINNEY:

10   Q    Can you tell me the start date and the end date of

11         exhibit 21?

12   A    The start date is February 15, 2010.  The end date

13         is, I would imagine, August 13, 2010.

14   Q    Okay.  Can you show meet page where it shows

15         August 13, 2010?

16   A    In this document it's not there, but this--

17   Q    Well, okay.  Stop, stop.  My question for you is --

18   A    For this?

19   Q    Exhibit 21 is in front of you, okay.  What is the

20         first date on that document?

21   A    February 15, 2010.

22   Q    What is the last date on that document?

23   A    April 16, 2010.

24   Q    Is there another version of that document that

25         covers a bigger period of time?
```

*BEYER REPORTING, INC.   (920) 733-7721*

```
1    A    Yes.

2    Q    And where is that?

3    A    It would be a part of the files in here

4         (gesturing.)

5    Q    Okay.  And when you say "in here," you're referring

6         to exhibit 17; is that correct?

7    A    That's correct.

8    Q    Now, where would I go on exhibit 17 to find the

9         document that we've marked as exhibit 21?

10   A    The document is called jobstats.xls.

11   Q    And what page of exhibit 17 is that?  What page is

12        it?

13   A    It's not specifically listed here, so--

14   Q    Just count backwards, so --

15   A    You're not understanding.  It's not one of the

16        individual files here.  It's in one of these

17        folders.  They didn't print what's in each of those

18        folders.

19   Q    Okay.  I'm trying--  All I want you to tell me then

20        is which folder do you believe that it's in?

21   A    Well, I definitely know that it would be in the

22        Outlook folder.

23   Q    Okay.  And the document itself would be?

24   A    An Excel spreadsheet.

25   Q    Okay.  And what would be the name of the file?
```

1  A    Jobstats.xls.

2  Q    Okay.

3              MR. JOHNSON:  Kevin, for the record, I

4       e-mailed that to your staff earlier today.  I don't

5       know if she forwarded it to.

6              MR. KINNEY:  Okay.  I have not seen it.

7              MR. JOHNSON:  Okay.

8  BY MR. KINNEY:

9  Q    Okay.  And so the document that we have marked as

10      exhibit 21, as you understand it, is actually

11      contained in the Outlook folder that is referenced

12      on exhibit 17?

13 A    Correct.

14 Q    And that if I opened up that document

15      electronically, I would find this document but it

16      would be extended out until August of 2010; is that

17      right?

18 A    That's correct.

19 Q    Okay.  Would it be prior to February 15, 2010?

20 A    I don't believe so.

21 Q    Okay.  Do you have any similar document prior to

22      February 15 of 2010?

23 A    I have a couple of things that I'm aware of.  One

24      was amongst the e-mails in Outlook folder.  There

25      was an e-mail that had an Excel spreadsheet

*BEYER REPORTING, INC.   (920) 733-7721*

1     attached to it that was hours-- It was basically an

2     Excel spreadsheet download of my calendar.

3             And in there you could see 800,

4     645--that was an indication of my hours worked.

5     Umm, and I don't recall the time-frame, but it

6     would have been a completely different time-frame

7     than this.

8  Q  And that document is--I will also find that in the

9     Outlook folder, correct?

10  A  That's correct.

11  Q  All right.

12  A  And as a reminder, the Outlook files that are in

13     that folder have to be opened through Microsoft

14     Outlook.  You can't just--

15  Q  Okay.

16  A  All right.

17  Q  Now, and then my understanding is that not every

18     day--a couple times a week, once a week, you would

19     enter your time into Workbrain, correct?

20  A  It varied, but for the most part, I would track it

21     on my calendar.  And then at the end of the week I

22     would fill out Workbrain, and so --

23  Q  And no one is sitting there watching you fill out

24     Workbrain, right?

25  A  No.

1  Q  Okay.  And then once you have got it filled out,
2     you submit it to your supervisor for approval,
3     correct?
4  A  It goes through the system.  I don't actually
5     physically do it, but it happens, yes.
6  Q  Okay.  Do you know of any instances where you were
7     not paid for the hours that you submitted?
8  A  I believe I was always paid for the hours I
9     submitted.
10 Q  Whatever you submitted you got paid for?
11 A  That's correct.
12 Q  If it was more than-- If it was more than 40 worked
13    hours in a week, you got overtime, correct?
14 A  Correct.
15 Q  Time and a half?
16 A  Well, if I recorded that it was over 40 hours, yes,
17    I would have been paid.
18 Q  Right.  And, for example, if you didn't accurately
19    record your hours, certainly the people in payroll
20    wouldn't know how many hours you worked, right?
21 A  That's correct.
22 Q  Okay.  And I believe your testimony is that your
23    direct supervisor--
24 A  One of them.
25 Q  -- or at least during the time you were working for

1     David Kohler, your direct supervisor basically

2     worked an eight-to-five schedule, right?

3  A  That's correct.

4  Q  So, if you didn't accurately report your time that

5     you started before or you stayed after her, she

6     wouldn't know that either, right?

7  A  That's not correct.

8  Q  Well, how would she know if she's not there?

9  A  I'm a very electronic person.  So, you can

10    basically track my work hours from my e-mail time

11    and dates.

12  Q  Why would she do that?

13  A  I sent e-mails to her.  And then she can

14    certainly-- She's a details person.  She certainly

15    could see if I was there until 7 P.M. sending her

16    an e-mail.

17           But you have to understand I did not

18    care that I wasn't being paid for overtime.  It

19    wasn't an issue to me.  I never brought it up and

20    complained to her about it.  That wasn't a problem.

21  Q  Well, you said you never complained about it, but

22    I've already put in like three or four different

23    e-mails where you're complaining about not getting

24    overtime?

25  A  Well, that was when I was able to put in for

1 overtime.

2 Q So, tell me exactly when you were not allowed to

3  put in for overtime?  When did that happen?

4 A It was when I was in David Kohler's office.  And

5  basically that first e-mail from Peggy where she

6  complained about that she saw I had overtime.

7    It was just before that, probably

8  within the month, that she told me the whole

9  department was in a crunch.  We needed to stop

10  putting in for overtime.  I said, that's fine.

11 Q Is that the same thing that she told you in the

12  e-mail a month or so later when she approved the

13  overtime?

14 A She approved the overtime but said, "I want you

15  working eight to five."  But the reason that e-mail

16  was pulled up and sent to her again is because she

17  was complaining.

18    If she didn't want me working more than

19  40 hours in the week, most of the time I didn't

20  mind it.  But she was--she was kind of grinding me

21  at that time, so I was being rigid about it.

22 Q Rigid about working eight to five, right?

23 A Well, no.  If I had to work overtime during the

24  week, on Friday I'd realize, I'm going to have more

25  overtime, so I need to leave early today.

```
 1              And that did not make her happy.  So,
 2        that's when she's being all, "No, you need to work
 3        Monday through Friday (pounding on the table.)
 4              And I'm like, well, you gotta make a
 5        choice here.  If you don't want me working
 6        overtime, I'm not going to basically know until
 7        Friday how much time I've put in this week.
 8              So, it was a mixed message.  And I
 9        couldn't win no matter which way I did it.  That's
10        the facts.
11              And, again, my attitude was not
12        typically that I cared about being paid for
13        overtime.  That is not how I operate.  I do my job,
14        and I make sure it's done well.
15              But when she starts complaining about
16        it, I'm like, you know what?  There's no room for
17        you to complain about my hours.
18   Q    All right.  Let's go back to the top.  The e-mail
19        that you produced and that I read during this
20        argument period seemed pretty clear that, number
21        one, Peggy had approved a payslip for you where you
22        had recorded more than 40 hours in a week, correct?
23   A    Correct.
24   Q    Okay.  And then she came back and said you
25        shouldn't be working overtime unless there were
```

| | | |
|---|---|---|
| 1 | | special circumstances, right? |
| 2 | A | Correct. |
| 3 | Q | And that you should be working Monday through |
| 4 | | Friday, eight to five, right? |
| 5 | A | Correct. |
| 6 | Q | I'm looking for the e-mail that says if you work |
| 7 | | more than 40 hours in a week, you're not allowed to |
| 8 | | write down your accurate time. |
| 9 | A | Again, whether it's an e-mail or not, I don't |
| 10 | | believe it was an e-mail.  I believe she said to |
| 11 | | us-- And it was more than just me. |
| 12 | Q | Who else? |
| 13 | A | There are other admin people on that same floor. |
| 14 | Q | Who else besides you did she say this to?  Give me |
| 15 | | their name? |
| 16 | A | Nobody in front of me, but I know that we discussed |
| 17 | | it. |
| 18 | Q | Well, then give me the name of the people that you |
| 19 | | discussed it with? |
| 20 | A | Okay.  Umm, let's see.  Jenny Muckerheide. |
| 21 | Q | Okay.  And what did you tell Jenny Muckerheide? |
| 22 | A | What did I tell her? |
| 23 | Q | Yeah. |
| 24 | A | I didn't tell her anything.  She told me that they |
| 25 | | weren't allowed to work overtime either. |

1   Q   Okay.

2   A   So, I'm assuming that that was part of it.

3   Q   And let me just-- Isn't that what Peggy told

4       you--you're not allowed to work overtime unless

5       there's a special project?

6   A   That's correct.

7   Q   Okay.  Did Jenny tell you anything else?

8   A   No.  But Peggy is also the one who told me that the

9       whole department had to cut out overtime; so, I

10      mean, that's fine.  I said, that was fine.

11   Q   Okay.  And you cut out overtime, right?

12   A   That's correct.

13   Q   All right.  When did Peggy tell you this?

14   A   I don't know the exact date.

15   Q   Well, was it before or after you finally understood

16      what Kohler's overtime policy was?

17   A   It was before.

18   Q   Okay.  And it was your understanding that you were

19      actually getting overtime based on working more

20      than eight hours in a day, or where you got paid

21      for a vacation holiday, jury duty, sick pay--that

22      type of thing?

23   A   Umm, how it happened was a sick day--they require

24      you to take eight hours of sick time if you're out

25      for the day when, in fact, if I worked

     1     three-and-a-half hours of overtime, I should really

     2     only have to take four-and-a-half hours of sick

     3     time, right?

     4   Q   I'm not being deposed.

     5   A   But do you understand what I'm saying?  I was

     6     trying to explain that to Peggy that you can't make

     7     me take eight hours of sick time and then say I

     8     don't get paid for my overtime as well.

     9   Q   Why not?

    10   A   Why can't I just take four and a half hours of sick

    11     time?

    12   Q   Because that's not the company's policy.

    13   A   But it's like screwing the employee.

    14   Q   Yes, you're correct.

    15   A   That's the policy?

    16   Q   Yes.  Now, and so at least that is part of the

    17     reason that you believe you were improperly paid,

    18     correct?

    19   A   A small part.

    20   Q   Okay.  Obviously, you had a pretty significant

    21     conflict with Peggy, correct?  You didn't like her,

    22     and she didn't like you.  Let's be honest.

    23   A   I would say I didn't like that she didn't like me

    24     because I'm very nice.

    25   Q   All right.  And then so you left Peggy's direct

```
 1      supervision in October of --
 2   A  2008.
 3   Q  -- 2008.  And you moved to the corporate HR
 4      function, you had a number of supervisors.  What
 5      was the overtime policy when you moved into
 6      leadership development?
 7   A  The same.
 8   Q  Which was?
 9   A  Don't work overtime.
10   Q  Don't work overtime, okay.  And did any one of your
11      supervisors in leadership development which you
12      moved into in 2008 tell you don't work overtime?
13   A  Yes.
14   Q  Who?
15   A  Lora Nigbur.
16   Q  Okay.  And she said?
17   A  "Do not work overtime."
18   Q  Okay.
19   A  "We're not budgeted for overtime, so don't work
20      it."
21   Q  Okay.  She didn't say, "Don't record it."  She
22      said, "Don't work it," right?
23   A  That's right.
24   Q  And would you follow the same Workbrain process;
25      that is, you would a few times a week, once a week,
```

```
 1        go in and record your time in Workbrain?
 2   A    Same process.
 3   Q    And then you would submit it to your supervisor?
 4   A    Um-hum, yes.
 5   Q    And at any time after you moved into leadership
 6        development are you aware of any instance where any
 7        of your supervisors ever changed your submission?
 8   A    I don't recall anything.
 9   Q    Do you have any knowledge or recollection of one of
10        your supervisors either cutting time or adding time
11        to your submission?
12   A    Not to my recollection, no.
13   Q    Okay.  Do you have any recollection of not being
14        paid for all of the hours that you submitted on
15        Workbrain?
16   A    I believe I was paid for all the hours I submitted.
17   Q    What were your hours when you worked in leadership
18        development?
19   A    Eight until five.
20   Q    And did you generally work eight until five?
21   A    Almost never.
22   Q    Okay.  Would you come in early?  Would you leave
23        late?  Would you do both?
24   A    Both.
25   Q    And would you record the actual time that you
```

1      worked?

2   A   Not in Workbrain.

3   Q   Where would you record it?

4   A   In my calendar, with a few exceptions.  There would

5       be some periods of time where I was so busy that I

6       just didn't do it because I was like, you know

7       what?  What's the point anyway?  I'm not going do

8       anything about it.  I just didn't do it because I

9       didn't have time.

10  Q   Didn't do what?

11  A   I didn't record it on my calendar.  There are

12      blocks of time where I didn't record it.  So, I

13      mean, they're just kind of periodic.  It was

14      usually because I was so busy.  That document

15      (gesturing) will not have any periods of time where

16      I didn't record it.

17  Q   Let's so that I understand exhibit 21, I'm going to

18      just start with the top sheet, okay.  There's a

19      field to the left that says worked; do you see

20      that?

21  A   Yup.

22  Q   All right.  And then there's a date 2/15, 2010,

23      Monday.  Underneath it has the number nine.  What

24      does that number mean?

25  A   That is that I worked nine hours that day.

```
 1    Q    Did you take a lunch that day?

 2    A    No.

 3    Q    How do you know?

 4    A    Because I worked nine hours.  Usually I didn't go

 5         to lunch.  And, actually, I can tell you that on

 6         Mondays while I was in talent sourcing, part of HR,

 7         which is the entire time of this, I worked every

 8         Monday during lunch basically because that was my

 9         day for phones.

10    Q    All right.  Under that it says started with, and it

11         says 237; what does that mean?

12    A    My e-mail in-box.  I received so many e-mails.

13         This document was not to record my number of hours

14         worked necessarily.  The reason I started this was

15         I felt my job was in jeopardy.  And I felt that it

16         was because I had more than I could possibly do.

17         Even if I worked overtime, I could never keep up.

18    Q    That's not my question.  My question is just what

19         237 means?

20    A    So, the answer to your question is how many e-mails

21         were in my box when I walked in the door.

22    Q    Okay.  And then I assume underneath where it says

23         98, that means how many were in your in-box when

24         you walked out the door?

25    A    Right.
```

1  Q   Okay.  And then below that it says career ops and
2      start with 140, ended with 115.  What does that
3      mean?
4  A   I had a number of e-mail boxes that I had to
5      follow.  And this is my in-box.  This is the career
6      opportunities in box.
7  Q   And then apparently you sent 78 e-mails, you
8      deleted 73, you set aside 31 for follow-up.  And
9      you had a number that needed to be filed, right?
10 A   Yup.
11 Q   All right.  Then you recorded hours that you spent
12     doing various things, right?
13 A   And that was used to track for who paid what
14     portion of my salary.
15 Q   Okay.  All right.  So, by my review in this
16     particular week, February 15th, you worked a
17     nine-hour day, you worked an eight-hour day, a
18     six-hour day, a nine-hour day and an eight-hour
19     day, right?
20 A   That's correct.
21 Q   Okay.  So, that's a total of 40 hours?
22 A   Forty hours.
23 Q   And you were properly paid?
24 A   No big deal, yup.
25 Q   Okay.  And then the next week it shows that you

|    |   |                                                           |
|----|---|-----------------------------------------------------------|
| 1  |   | worked 9.5 hours, followed by 8.5 hours, followed         |
| 2  |   | by 6.5 hours, followed by 9, followed by 8, right?        |
| 3  | A | Um-hum.                                                   |
| 4  | Q | Okay.  How do you get 41.5?                               |
| 5  | A | Well, it's an automatic calculation, just if you         |
| 6  |   | add them.                                                |
| 7  | Q | Okay.  1.5, 2, 3, minus 2.5.  I come up with 40.5,       |
| 8  |   | unless I'm just not doing the math right.                |
| 9  | A | One, two--                                               |
| 10 | Q | No, you're right.                                        |
| 11 | A | Yeah, they're all natural calculations, so --           |
| 12 | Q | Yeah, it's just I was looking at the-- Okay.  And        |
| 13 |   | I guess what strikes me, there's nothing on this        |
| 14 |   | document that would indicate, quote, why you worked      |
| 15 |   | nine hours on Monday, right?                             |
| 16 | A | Yeah.  It may possibly be in my calendar.  Like a        |
| 17 |   | lot of times I would put, you know, eight plus one       |
| 18 |   | for no lunch, and I would put in parenthesis no          |
| 19 |   | lunch.                                                   |
| 20 | Q | Okay.                                                    |
| 21 | A | So, it would be in my calendar probably what the        |
| 22 |   | actual reason was.                                       |
| 23 | Q | If I can find that calendar, it might show me why?      |
| 24 | A | Exactly.                                                 |
| 25 | Q | Okay.  But based on this, when it says nine, I          |

1        can't tell if that means that you were there for

2        nine or that you worked nine, right?

3   A    Yeah.

4   Q    It doesn't--  It just--

5   A    Nine hours that were work time, so --

6   Q    But by --

7   A    No.  It actually absolutely was the hours worked;

8        not just that I was at Kohler.

9   Q    Well, what did you do for lunch?  Where did you go

10       for lunch?

11  A    Well, during this job I was so overloaded, I didn't

12       go a lot.  I actually ordered in and ate at my desk

13       while I was working.

14  Q    So, you definitely ate lunch every day?

15  A    Yeah, yes.  I-- I'm an eater, so--

16  Q    Okay.  And where would you order in from?

17  A    The American Club, Black Wolf Run, and they knew

18       me.  I mean, they knew me well.  So, they knew that

19       they would just send it over with security, and

20       he'd bring it over for me.

21  Q    Okay.

22  A    Sometimes I would order from a Chinese take-out,

23       and they would deliver it to us.

24  Q    Okay.

25  A    Sometimes I would ask the other girls, you know,

1    I'm ordering; do you want anything, so --

2  Q   Yeah.  And, again, I'm just picking this very first

3      day.  When you look at exhibit 21, can you tell me

4      right now if that's because you came in early,

5      because you did not take a lunch, or because you

6      stayed late?

7  A   It does not indicate that at all.

8  Q   And you would have no way of knowing that, right?

9  A   If I had my calendar, I could, yes.

10 Q   Okay.  And then when you submitted Workbrain for,

11     again, this first week in February, what did you

12     submit on Workbrain for that week?

13 A   My guess is I would just leave it as it was and

14     push submit.

15 Q   Why?

16 A   Well, because they care about the number of hours;

17     not what exact day it was.  And it was filled in

18     already.  It was easy.

19          I was very busy when I was in this job.

20     So, for me to take--for something so nitty-gritty,

21     it was stupid.  It was just, I wanted it done so I

22     could get out of there.

23 Q   Okay.  So, the only record your supervisor has when

24     you're in this job, which is the corporate HR, is

25     whatever you submitted?

*BEYER REPORTING, INC.  (920) 733-7721*

1    A    Again, I would send her e-mails.

2    Q    I didn't ask that.  I mean, the document that you

3         submitted that says, this is what I worked this

4         week --

5    A    Um-hum.

6    Q    -- was the Workbrain document, right?

7    A    She saw me there after hours.

8    Q    I didn't ask you that.  I said, the document that

9         you would have submitted would have said what it

10        said, right?

11   A    Forty hours.

12   Q    Okay.

13                  MR. KINNEY:  Why don't we take a break?

14                  (Whereupon a recess was taken record.)

15        paper back in the tray.

16   BY MR. KINNEY:

17   Q    After a longer-than-I-anticipated-break, we are

18        back on the record.  Again, after you moved into

19        the leadership development role or department, did

20        you receive any document, e-mail, memoranda,

21        etcetera, from anyone at Kohler that advised or

22        instructed you not to record your time?

23   A    Never.

24   Q    Okay.  After you moved into the corporate

25        leadership job, did any of your direct bosses, any

*BEYER REPORTING, INC.   (920) 733-7721*

1      of your direct supervisors ever tell you, "Don't

2      record your time?"

3  A   No.

4  Q   Okay.  And after you were in that leadership

5      position, at least on occasion, you did report and

6      get paid for more than 40 hours, right?

7  A   I-- I don't know about that.  I'd have to check.

8  Q   Okay.

9  A   I really couldn't tell you for sure.

10 Q   Okay.  And also, at least on occasion, during that

11     period you got paid for less than 40 hours, right?

12 A   Yes, I would guess so.

13 Q   Okay.  There were days where-- Or excuse me.  There

14     were pay weeks for whatever reason you did not work

15     a full 40 hours and you did not have enough

16     vacation, sick, bereavement time to--

17 A   I do believe I recall that--that happened at least

18     once, so --

19 Q   Okay.  Now, on those, I'll call them, short weeks,

20     less than 40 hour weeks, how would you fill out

21     your Workbrain time-slips so that you would get

22     less than 40 hours?  What would you do?

23 A   I can see myself doing it both ways.  I could see

24     myself doing it where I would put each one in, you

25     know, just for record.  And then if I'm in a hurry,

Case 2:09-cv-00842-WEC  Filed 05/10/11  Page 71 of 98  Document 76-6

1   I could see saying, cut out two of the days, and --

2 Q The example that you just gave me--are you telling

3   me, this is how you could have done it?  Or are or

4   you actually remember doing it that way?

5 A I-- I mean, it's kind of vague.  But I would guess

6   that I would have done it both ways.

7 Q And, again, so you're not-- All I'm trying to drive

8   at, Ms. Fleischmann, is--

9 A Yeah, I can't tell you for sure, I guess.  That's

10   what I'm saying.

11 Q That's a much better answer then.

12 A Okay.

13 Q Okay.  Again, I believe I've already asked you

14   this, too, but at least to your knowledge once you

15   moved into the leadership development area, that

16   none of your supervisors went in and either

17   increased or decreased the number of hours you

18   submitted?

19 A Not to my knowledge.

20 Q And, again, to your knowledge, no one in payroll

21   went in and increased or decreased the number of

22   hours that you submitted, right?

23 A That I would have to say may not be the case.

24 Q Okay.  Do you have an example of where you believe

25   that payroll adjusted your hours?

*BEYER REPORTING, INC.   (920) 733-7721*

1    A    No.  I'm not positive about this, but I believe in

2         those e-mails in that Outlook folder, there might

3         be a e-mail in there from-- There's like a string

4         of e-mails about how many vacation hours I had or

5         something like that and how many hours I actually

6         worked.

7                   And I forget the exact circumstance,

8         but it was a situation where when I was on

9         vacation, I worked from there because it was easier

10        than coming back to a mess.

11                  So, I would just log in here and there

12        during my vacation and work.  So, while I was

13        there--and I can't recall the exact

14        circumstance--but I remember being upset about how

15        they handled it.

16                  Now, I wouldn't say that they were like

17        changing like if I had overtime hours.  It wasn't

18        like that.  It wasn't about overtime as much as it

19        was the hours that I worked and then what I had to

20        use for vacation.

21   Q    Okay.  But you were paid for the hours.  The

22        argument was whether or not they should have been

23        charged to vacation or not?

24   A    Yeah.  It was probably like that.  I can't recall

25        exactly, but my guess is, yeah, that's probably

1        close, closer to it.

2    Q   Much like the sick-pay issue that you had brought

3        earlier where you didn't like the fact that if you

4        went home early because you weren't feeling well,

5        Kohler made you burn eight hours of sick pay,

6        right?

7    A   No.  That isn't really exactly what I was trying to

8        say.  I was trying to say that I had

9        three-and-a-half hours of overtime already, and

10       then I was sick for a day.  Yes, that would be

11       eight hours of sick pay, but what about that

12       three-and-a-half hours of overtime that I put in

13       prior to that?

14   Q   Right.  And again --

15   A   So, like, they're saying I have to use eight hours

16       of sick time and lose that three-and-a-half hours.

17       So, really, I kind of felt like that was a double

18       screw, you know.

19   Q   Okay.  And, again, but your definition of overtime

20       is simply more than eight hours in a day.  That's

21       the three and a half that you're talking about,

22       right?

23               MR. JOHNSON:  Objection, misstates

24       testimony.

25               MR. KINNEY:  Okay.  Let me try again.

*BEYER REPORTING, INC.   (920) 733-7721*

```
 1   BY MR. KINNEY:
 2   Q   When you said, "I had three and a half," you meant
 3       that like on Monday or Tuesday or Wednesday you'd
 4       worked a nine, a nine, a nine-and-a-half-hour day?
 5   A   Um-hum, yes.
 6   Q   And then you missed work on Friday because you were
 7       sick.  And Kohler would then say, okay, well, first
 8       we're going to make you use--you gotta burn eight
 9       hours of sick pay, and it doesn't count towards the
10       40 hours.  So, therefore, in your mind you were
11       losing the three-and-a-half hours of extra work
12       you'd built up, right?
13   A   That's correct.
14   Q   Okay.  Okay.  So, again, at least at that time,
15       your definition of overtime was working more than
16       40 hours--or more than eight hours in a day?  And,
17       again, based on these e-mails, that's pretty
18       obvious.
19   A   Yeah, and it was really the issue of that I
20       shouldn't have to burn eight hours of sick time.
21   Q   Because you had already worked more?
22   A   And that was my issue.
23   Q   Okay.
24               MR. KINNEY:  Okay.
25               (Whereupon exhibit 22 was marked for
```

*BEYER REPORTING, INC.  (920) 733-7721*

```
 1        identification.)
 2   BY MR. KINNEY:
 3   Q   I'm going to show you what I've marked as exhibit
 4       22 which is, I'm going to tell you, it's a
 5       screen-shot from Workbrain for the week of
 6       February 22, 2010.  I can make a copy of it if we
 7       need it right now even.
 8   A   I need my glasses.
 9                 MR. JOHNSON:  You will.
10                 MR. KINNEY:  Yeah, or longer arms.
11   BY MR. KINNEY:
12   Q   Ms. Fleischmann, my question to you now is:
13       Looking at exhibit 22, which is the Workbrain
14       snapshot --
15   A   Um-hum.
16   Q   -- and then going back to exhibit 21 which is your
17       generated document --
18   A   Okay.
19   Q   -- how many hours did you report for Monday?
20   A   Monday, nine-and-a half.
21   Q   Okay.
22   A   Is that what it is here?  Yup.
23   Q   Okay.  And how many hours did you report on
24       Tuesday?
25   A   Eight.
```

```
 1   Q   Okay.  And your document though shows --

 2   A   Eight-and-a-half.

 3   Q   Eight-and-a-half?

 4   A   Um-hum, yeah.

 5   Q   Okay.  And now how many hours did you report on

 6       Wednesday?

 7   A   Six-point-five.

 8   Q   Okay.  And what does your document show?

 9   A   Six-point-five.

10   Q   Okay.  And on exhibit 22 how many hours did you

11       record in Workbrain?

12   A   Eight.

13   Q   Is that what it says?

14   A   It's an eight, yes.

15   Q   Okay.  And how many did you record on your

16       document, exhibit 21?

17   A   Nine.

18   Q   Okay.  And on Friday in Workbrain what did you put?

19   A   Eight.

20   Q   What does your document show?

21   A   Eight.

22   Q   Okay.  So, now, look at Workbrain.

23   A   Um-hum.

24   Q   Okay.  Monday Workbrain gives you credit for a

25       total of 9.5 worked hours and one hour of unpaid
```

*BEYER REPORTING, INC.  (920) 733-7721*

1       lunch, right?

2   A   Yes.

3   Q   So, the Monday column then is correct, isn't it?

4   A   That's correct.

5   Q   Okay.  And then on Tuesday Workbrain gives you

6       credit for eight hours of work time plus one hour

7       of unpaid lunch for a total of nine hours, right?

8   A   Um-hum.

9   Q   Okay.  And --

10  A   Not really nine.  It was eight.

11  Q   Well, eight plus one?

12  A   One was unpaid.

13  Q   Right.  I understand that, okay.  Well, what did

14      Workbrain pay you for on Tuesday; how many hours?

15  A   Well, it looks like it says nine, but it's a eight.

16  Q   Okay.

17  A   Well, hold on a second.

18  Q   Well, it does say nine?

19  A   It does say nine.

20  Q   Yeah.

21  A   And that's--so they're adding together the paid and

22      the unpaid.

23  Q   Correct.

24  A   Okay.

25  Q   Right.  But how you've tried to explain it to me is

```
 1       that the number I'm looking at the top is the
 2       number of hours that you worked.
 3    A  That's correct.
 4    Q  Okay.  And what I'm seeing here is that you said I
 5       worked nine-and-a-half on Monday.  And Workbrain
 6       says, yeah, that's what you put down?
 7    A  That's correct.
 8    Q  Okay.
 9    A  But here I had to stop putting overtime, so I put
10       eight because this day I was gone for an
11       hour-and-a-half early or came in an hour-and-a-half
12       late--I'm not sure based on this.
13                 But I can tell you I had to go and say,
14       no, this has to be eight because I can't have more
15       than 40 hours on here.
16                 So, I stopped putting the OT in right
17       there, and that includes here I did not put that
18       hour either.  Because I already made up for what I
19       missed on Monday, okay.  So, I just had to take
20       that point-five off, and I took one off of there,
21       so it was a 40-hour week.
22    Q  So, what I'm hearing you tell me now is that you
23       didn't work a full eight-hour day on Wednesday,
24       right?
25    A  That's correct; six-and-a-half hours.
```

*BEYER REPORTING, INC.   (920) 733-7721*

1  Q    Right, right; for whatever reason?

2  A    Right.

3  Q    Okay.  And --

4  A    But I have to make sure that I record that I was

5      not there a full eight hours.  So, I always--I

6      always tried to do that--make sure that if I wasn't

7      there and somebody came back and said, you weren't

8      here that afternoon, that I am covered.

9             Like you're right, I wasn't here, and I

10     did not take that I was here.  Now, there might

11     have even been a couple of examples where I didn't

12     do that because I was so hurried, but for the most

13     part, I always tried to make sure--cover your back

14     side.  That's just how I always tried to be.

15  Q    I mean, you're the one, though, that is making the

16     Workbrain entries though, correct?

17  A    That's right, based on what I was told.  Nothing

18     over 40 hours.

19  Q    Don't work over 40 hours, right?

20  A    That's right.

21  Q    Okay.

22  A    And I satisfy my employer by doing my job as well

23     as I can no matter how many hours it takes me,

24     okay.  And I wasn't upset about working a little

25     extra hours.  That is not my issue.

```
 1   Q    Well, it is now obviously?

 2   A    Well, it is now.  That's because Kohler has a

 3        problem with showing their loyalty right back.

 4   Q    Okay.

 5                  (Whereupon exhibit 23 was marked for

 6        identification.)

 7   BY MR. KINNEY:

 8   Q    Anyway, Ms. Fleischmann, at the time that you left

 9        Kohler, they paid you some severance that you were

10        not otherwise entitled to, correct?

11   A    Yes, correct.

12   Q    Okay.  I have two very specific questions.  If you

13        look at the second sentence of that document:  "I

14        further acknowledge and agree that I have been paid

15        all wages, benefits and other compensations owed to

16        me by the company through and including," and "that

17        I'm not entitled to any future compensation or

18        benefits arising out of my employment with the

19        company."  What are we doing here today then?

20   A    Okay.  I will tell you two things about that.

21        First off, they gave me this before I even got any

22        severance.  And I said to him, well, I mean, why do

23        you want me to sign this now?  You're saying I

24        don't get the severance?  Or what are you saying

25        exactly?
```

*BEYER REPORTING, INC.   (920) 733-7721*

```
 1            He said, no, it's just a formality, you
 2       know.  It's a typical contract.  I'm like, okay.  I
 3       said, what about the fact that I've been in touch
 4       with the attorneys working on the Jennifer Vang
 5       trial, or case, whatever.
 6            And he said, hey, if-- That's a
 7       separate issue.  If you have worked hours that you
 8       have not been paid for, that's a completely
 9       separate issue.  This is for right now.
10   Q   Which attorney said this to you?
11   A   Paul Cardish (phonetic).
12   Q   Okay, all right.  Then let's go on then to page
13       two.
14   A   Okay.
15   Q   "I represent and agree that I have returned any and
16       all Company records, files, keys, documents,
17       software," etcetera, etcetera, etcetera.  All
18       right.  Obviously, you have all of these
19       documents--thousands of pages of documents.
20            I mean, how did that happen?
21   A   I just didn't realize I had it until my computer
22       crashed for the second time, and I went to upload
23       some files, and I was kind of poking around in
24       there.  And all of a sudden I realized I had all
25       these Kohler documents.
```

*BEYER REPORTING, INC.   (920) 733-7721*

1                 Now, this was This--like within a week,

2     okay.  And Larry called me --

3            MR. JOHNSON:  Umm--

4            THE WITNESS:  Sorry.

5            MR. JOHNSON:  You're not talking about

6     what you and I discussed.

7   BY MR. KINNEY:

8   Q   All I want to know is:  When did you discover you

9     had all of these Kohler documents?

10  A   About a week ago.

11  Q   Okay.  So, did you ever flex your hours?

12  A   Yes.

13  Q   Start a little late one day --

14  A   Um-hum.

15  Q   -- come in a little early the next?

16  A   Yup.

17  Q   And did you monitor that yourself, you know, kind

18     of keep, I'll call it, a running tally, a running

19     score sheet of where you were at?

20  A   Yeah, on my calendar I would have--

21              (Knock on the conference door;

22     whereupon a discussion was held off the record.)

23  BY MR. KINNEY:

24  Q   Let's begin with the flex policy.  Did you flex by

25     keeping track of it yourself, or did you work with

1     your supervisor to keep track of it?

2  A  I had a supervisor in every position.  So,

3     typically I would have had to share that with them

4     somehow.

5  Q  Okay.  What I'm trying-- We know that some days you

6     came in early, some days you came in late, some

7     days you left early, some days you left late, okay,

8     beyond your normal eight-to-five-type of schedule,

9     correct?

10  A  That's correct.

11  Q  Okay.  What I'm saying is:  Was the flex policy

12     formal or informal?  Start there.

13  A  Can you tell me the difference?

14  Q  If you are going to flex your schedule, did you

15     have to fill out a form or a document and get it

16     signed by you and signed by the supervisor?

17  A  No.

18  Q  Okay.  Was it something where you just kept track

19     of, oh, I started late today and I've got to come

20     in early tomorrow?

21  A  Yes.

22  Q  Okay.  Did you have to give your supervisor, like,

23     a report?

24  A  No.

25  Q  Okay.  I mean, so, you know, if you came in a half

1     hour early one day, and then left a half hour

2     earlier the next day--

3  A  I didn't come in late ever.  That wasn't ever an

4     issue unless I had an appointment in which case I

5     would have gotten her okay.

6  Q  You would have said, look, I'm going to be in late

7     tomorrow.  I've gotta go to the doctor or dentist

8     whatever, right?

9  A  Right, right.

10  Q  Okay.  And then the supervisor says, great, fine?

11  A  Yeah.

12  Q  Okay.  And you'd say, I'll make it up, or I'll make

13     it up today, or I'll make it up tomorrow--something

14     like that?

15  A  Right.

16  Q  Okay.  And that was the extent of it, right?  I

17     mean, there wasn't a formal documentation you had

18     to put together?

19  A  Yeah, never.  To my knowledge, I never put anything

20     together.

21  Q  Okay, okay.  And, again, I'm going to look at all

22     those e-mails, but am I going to see an e-mail that

23     says, hey, I came in early today.  I'm going to

24     leave late tomorrow, or --

25  A  Sure.  I'm sure there will be stuff like that,

```
 1      yeah.
 2   Q  Okay.  And then it was up to you to record the
 3      hours that you worked, right?
 4   A  Yeah.  I absolutely always recorded it.
 5   Q  Okay.  Now, would it be more likely that you would
 6      come in later, come in early?
 7   A  Come in early.
 8   Q  Okay, come in early, okay.  And then if you were
 9      flexing, then you would leave early that day,
10      right?
11   A  Umm, in a perfect day?
12   Q  Yeah, in a perfect day, perfect world, okay, I came
13      in a half hour early because I had a meeting, and
14      so I'm going to leave a half hour early that night?
15   A  Yeah.
16   Q  Okay.  In that case, you would still have worked
17      the same number of hours; just a different start
18      time, quit time, right?
19   A  Um-hum, um-hum.
20   Q  You have to say yes or no?
21   A  Yes, sorry.
22   Q  That's all right.  Did you ever come in early like
23      on a Monday and then leave early but not until
24      Tuesday or Wednesday?
25   A  Yes.
```

1    Q    Okay. How would you account for those hours then?

2         Would you record them accurately? Would you record

3         like seven-and-a-half on Monday and then

4         eight-and-a-half on Wednesday?

5    A    Like I said before, I believe I would have probably

6         done it both ways. Sometimes when I was in a

7         hurry, I would just know that I did 40 hours,

8         or--you know what I mean--more than 40 hours, so I

9         would just put 40 in.

10    Q    Um-hum.

11    A    And not worry about the exact numbers. As long as

12         I wasn't putting in for more than 40 hours, they

13         wouldn't care.

14    Q    Okay. And did you ever go in into Workbrain and

15         like on those days that you may have come in early

16         or left late or any of those combinations--did you

17         ever go in and just adjust the start time or quit

18         time?

19    A    I always, almost always did it on my calendar and

20         then at the end of the week I would put it into

21         Workbrain, so my calendar would always be accurate.

22    Q    Okay.

23    A    So, any time if somebody said, hey, you know,

24         didn't you leave early that day? Then I would be

25         able to go back and say-- And for the most part in

*BEYER REPORTING, INC. (920) 733-7721*

```
 1        Workbrain, I would put if I left early, but I
 2        didn't necessarily put if I came in early because,
 3        again, you have complications with later in the
 4        week where I have to put less.  Then it makes it
 5        look like I did a short day when actually I didn't.
 6        So, a lot of times I would just leave it straight
 7        eight across.
 8   Q    Okay.
 9   A    Again, the only time I ever worried about exactly
10        how it was put into Workbrain is when I was
11        concerned that somebody would come back at me and
12        say-- I mean, they're not going to come back at me
13        and say, hey, I saw you here at six-thirty.  You
14        have-- You don't have enough hours on your time
15        sheet.  Nobody is going to do that.
16                  But they might come back to me and say,
17        hey, you weren't here until nine o'clock.  Where
18        did that hour go?  And so I always try to make sure
19        that that was accurate.
20   Q    Who is coming back at you about not being here?  I
21        mean, who was that?
22   A    You know, I mean I'm sure you have guessed it by
23        now, but Peggy and I didn't get along
24        fantastically.
25   Q    Right.
```

```
 1   A    And I just know to cover myself.  I didn't ever
 2        want an issue.
 3   Q    Okay.  So, for lack of a better word, I'll say that
 4        you were fudging your Workbrain time-slips so that
 5        you didn't have problems with Peggy--fair
 6        statement?
 7   A    I don't know.  Umm, I was making sure that they
 8        were not more than 40 hours --
 9   Q    Yeah, and you were also--
10   A    -- because she would not, you know.
11   Q    Right.  And you were also making sure that it
12        looked like you were there all day, every day?
13   A    What I didn't want to happen-- No, you've got that
14        wrong.  If I wasn't there all day, I tried to make
15        sure that that was on there, that that was
16        recorded.  Because, again, that was-- If you want
17        to call that fudging the numbers, that's actually
18        being very accurate.
19                   I made sure that I was recording the
20        hours that I wasn't in between eight and five
21        because I didn't want her coming back at me.
22                   Now, if she already gave me permission,
23        then she already knows about it.  It's not a big
24        deal.  So, then it wouldn't matter.
25                   But, if, you know, like on a-- Say, I
```

1   had to come in late because my kids had a dentist

2   appointment and I had gotten her permission

3   already, but I would try to make sure that my

4   Workbrain said that I wasn't there until 9:00 or

5   10:00 A.M. because, again, I didn't want someone

6   coming back to me and saying I was here, you were

7   not here.

8   Q   Okay.

9           MR. KINNEY:  I'm not going to end your

10  deposition.  I'm simply going to suspend it.  You

11  know, obviously we're trying to look at the files

12  that you produced today.  There are a lot of things

13  that are probably not relevant at all.

14          THE WITNESS:  Yeah.

15          MR. KINNEY:  And I would suspect much

16  of what is on those disks is not going to have any

17  relevance to this litigation.  But some of it I

18  think perhaps will based on some of your answers,

19  so, again, I'm not going to-- And you understand

20  why I'm doing that, Larry.

21          MR. JOHNSON:  I understand what you're

22  saying.  You could have asked for the information

23  earlier than with the deposition.

24          MR. KINNEY:  You could have produced it

25  earlier, too, but apparently --

 1              THE WITNESS:  Well, I didn't even know

 2        I had it.

 3              MR. KINNEY:  -- the fact of the matter

 4        is, we've just got the answer from the witness who

 5        said that it didn't even exist in her mind until a

 6        few days ago.

 7              MR. JOHNSON:  I understand what you're

 8        saying.  I have a couple follow-up questions real

 9        fast.

10                  E X A M I N A T I O N

11   BY MR. JOHNSON:

12   Q    Exhibit number 21, the Excel spreadsheet or the

13        printout of the Excel spreadsheet--did you ever

14        e-mail that to your supervisor?

15   A    Yes.

16   Q    Did you ever hand any portion of this to your

17        supervisor?

18   A    Yes.

19   Q    All right.  Take a look at exhibit number 22.

20        Where on exhibit number 22 does it state the

21        specific time that you started on any workday?

22   A    You know, it doesn't on this.  This is like a final

23        submitted form, but actually when you first open it

24        up, it actually says, you know, six, zero, zero,

25        zero, which indicates regular pay time.

*BEYER REPORTING, INC.   (920) 733-7721*

1  Q  Um-hum.

2  A  And it will have eights, eight hours across Monday

3     through Friday.  And then underneath it--I'm not

4     positive--but I think it actually puts your unpaid,

5     like your lunch time in there if I recall it

6     correctly.

7              And then there's another couple of

8     lines of empty blanks.  And that would be so that

9     if took a sick day, you'd put the correct code in

10    there and then go across, okay.

11 Q  Okay.  My question is:  In Workbrain-- Strike that.

12    When you said it said eight o'clock across the line

13    in Workbrain --

14 A  Yup.

15 Q  -- were you told to change that to when you

16    actually started work that day?

17 A  Well, I mean I guess it was assumed that if I

18    started earlier, that I would change it.  Or if I

19    started later, that I would change it.

20             But if someone says you can't work

21    overtime, then you start altering what you assume.

22    And so that's basically --

23 Q  Okay.  Did you record the actual start time of your

24    work each day?

25 A  Not each day, but some days.

```
 1    Q    Okay.  And did you record the actual end time of
 2         your workdays each day?
 3    A    Sometimes, but most of the time, no.
 4    Q    Okay.
 5    A    At least during the time period where we shouldn't
 6         have overtime I didn't worry about it.
 7    Q    Okay.  And did you record the start time of any
 8         unpaid break?
 9    A    Well, I didn't have breaks, so --
10    Q    Okay.  Did you ever take an hour lunch?
11    A    Oh, lunches, yes.
12    Q    Okay.  And was that lunch unpaid?
13    A    Well, most of the time I worked through lunch, but
14         it already had an hour off for lunch.
15    Q    Right.  Let me ask this way.  Was there anywhere in
16         Workbrain where you would record the start time of
17         your unpaid one-hour lunch break that you were
18         supposed to take?
19    A    I'm sorry, can me ask me that again?  I'm sorry.
20    Q    That's fine.  Was there anywhere in Workbrain where
21         you would record the actual start time of your
22         unpaid one-hour lunch break?
23    A    Oh, no, no.  It was just, I think, they just
24         assumed that it was twelve to one.
25    Q    Okay.  And was there anywhere in Workbrain that you
```

*BEYER REPORTING, INC.  (920) 733-7721*

1      would record the actual end time of your one-hour

2      unpaid lunch break?

3  A   No.

4  Q   Okay.

5              MR. JOHNSON:  That's all I have.

6              MR. KINNEY:  Okay thank you.  I don't

7      have anything else.

8              (Whereupon the proceedings were

9      adjourned.)

10

11                        *  *  *  *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*BEYER REPORTING, INC.  (920) 733-7721*

```
1   STATE OF WISCONSIN   )
                         )  SS:
2   MILWAUKEE COUNTY     )

3

4

5            I, SHARON KAY BEYER, a Registered

6   Professional Reporter and Notary Public in and for the

7   State of Wisconsin, do hereby certify that the above

8   proceedings were recorded by me on the 3rd day of May,

9   2011, and reduced to writing under my personal

10  direction and is a true, correct, and complete

11  transcription of my stenographic notes.

12           I further certify that I am not a relative or

13  employee or attorney or counsel of any of the parties

14  or a relative or employee of such attorney or counsel

15  or financially interested directly or indirectly in

16  this action.

17           In witness whereof, I have hereunder set my

18  hand and affixed my seal of office in Appleton,

19  Wisconsin, this 10th day of May, 2011.

20

21

22                      _____

23                      NOTARY PUBLIC
                        IN AND FOR THE STATE OF WISCONSIN
24

25  My commission expires: November 15, 2012.
```

1          BEYER REPORTING, INC. 920-733-7721

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        *ERRATA SHEET*

2     *CORRECTIONS TO DEPOSITION*

3              The witness, APRIL FLEISCHMANN, states

4     that she wishes to make the following corrections in the

5     transcript of the deposition taken May 3, 2011.

6

7     PAGE     LINE        SHOULD READ

8

9     _____    _____    _____

10    REASON FOR CHANGE: _____

11    _____    _____    _____

12    REASON FOR CHANGE: _____

13    _____    _____    _____

14    REASON FOR CHANGE: _____

15    _____    _____    _____

16    REASON FOR CHANGE: _____

17    _____    _____    _____

18    REASON FOR CHANGE: _____

19    _____    _____    _____

20    REASON FOR CHANGE: _____

21    _____    _____    _____

22    REASON FOR CHANGE: _____

23    _____    _____    _____

24    REASON FOR CHANGE: _____

25

*BEYER REPORTING, INC.   (920) 733-7721*

```
1   STATE OF WISCONSIN    )
                          )   SS:
2   MILWAUKEE COUNTY      )

3

4

5

6            I,  April Fleischmann, do hereby certify that I

7   have read the foregoing transcript of proceedings; and to

8   the best of my knowledge and belief, the same is true and

9   correct except for the list of corrections noted on the

10  annexed page.

11           Dated at _____ this _____ day of

12  _____, 2011.

13

14  _____

15  April Fleischmann

16

17

18  Subscribed and sworn to before me
    this _____ day of _____, 2011.

19

20

21

22  Notary Public

23  My Commission Expires: _____

24

25
```

BEYER REPORTING, INC.   (920) 733-7721