| | |
|---|---|
| Jennifer Vang,<br>on behalf of herself and all others<br>similarly situated,<br><br>           Plaintiffs,<br><br>Kohler Co.<br>a Domestic Corporation,<br><br>           Defendant. | CIVIL ACTION No. 710<br><br>Case No.: 09-cv-000842-WEC<br>Jury Trial Demanded |

### DEFENDANT KOHLER CO.'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION FOR DECERTIFICATION OF PLAINTIFF'S COLLECTIVE ACTION CLASS AND DISMISSAL OF THE OPT-IN PLAINTIFFS

Respectfully submitted this 19th day of August 2011.

        KRUKOWSKI & COSTELLO, S.C.
        Kevin J. Kinney, Esq.
        Keith E. Kopplin, Esq.
        1243 N. 10th Street, Suite 250
        Milwaukee, WI 53205

        ATTORNEYS FOR DEFENDANT
        KOHLER CO.

# TABLE OF CONTENTS

| | | Page No. |
|---|---|---|
| I. | Introduction | 1 |
| | A. The exact wording of each supervisor's alleged instruction does matter | 1 |
| | B. Kohler Co.'s time records comply with the Fair Labor Standards Act | 4 |
| | C. There is no proof that any of the opt-ins has, in fact, worked any hours for which she was not properly compensated | 5 |
| II. | Legal Argument | 8 |
| | A. Plaintiff's case are not on point | 9 |
| | B. Because Plaintiff has failed to demonstrate that she is similarly situated to any of the other opt-ins, her collective action class should be decertified and the other opt-ins dismissed | 11 |
| III. | Conclusion | 14 |

# TABLE OF AUTHORITIES

**Page No.**

## **CASES**

*Anderson v. Mt. Clemens Pottery Co.*
328 U.S. 680 (1946)......................................................................................................5, 6, 12

*Austin v. CUNA Mut. Ins. Society*
322 F.R.D. 601 (W.D. Wis. 2006) ...............................................................................................1

*Desert Palace Inc. v. Costa*
539 U.S. 90 (2003).......................................................................................................................8

*Kasten v. Saint-Gobain Performance Plastics Corp.*
556 F. Supp. 2d 941 (W.D. Wis. 2008) .....................................................................................10

*Mooney v. Aramco Services Co.*
54 F.3d 1207 (5th Cir. 1995) ..................................................................................................8, 11

*Russell v. Illinois Bell Telephone Company*
721 F. Supp. 2d 804 (N.D. Ill 2010) ..........................................................................................11

*Scott v. New York*
592 F. Supp. 2d 501 (S.D.N.Y. 2008).........................................................................................4

*Shain v. Armour & Co.*
40 F. Supp. 488 (W.D. Ky. 1941).........................................................................................9, 10

*Spoerle v. Kraft Foods Global, Inc.*
253 F.R.D. 434 (W.D. 2008) .....................................................................................................10

## **STATUTES**

29 C.F.R. 516.2(a)(7) ...................................................................................................................4

29 U.S.C. § 216(b)      ................................................................................................................8

**I.     Introduction.**

Plaintiff has failed to carry her burden of establishing that she and the other opt-ins are, in fact, similarly situated. The collective action class should be decertified, and the opt-ins dismissed, as a result.

**A.     The exact wording of each supervisor's alleged instruction does matter.**

Plaintiff continues to ignore the significance of the testimony submitted in this case. (Dkt. 92, at 6.) To be told not to *record* overtime implies knowledge that you have already worked more than your regular schedule. Why else would you be told not to record your overtime? To be told not to *work* overtime, by contrast, carries no such implication. In fact, there is a contrary implication – there is no basis to assume a person is working overtime if they have been told not to. The opt-ins' vacillation on this point not only casts doubt on their overall credibility, it also cuts to the heart of this lawsuit.

Not only is the allegation that opt-ins were told not to record overtime more probative of the fundamental question in this case, it was also an express basis for the Court's November 29, 2010 Order. This is no coincidence. If multiple supervisors had, in fact, issued the same instruction to their subordinates not to record the overtime hours they had already worked, it would suggest a common source for that directive, somewhere up the corporate ladder. By locating that source, and confirming its instruction, there could be at least some evidence to support a group action on behalf of the subordinates, who reported to the supervisors, who received the instruction. That, in fact, is the main objective between conditional certification and decertification; namely, conducting discovery to confirm the allegations that supported conditional certification. *See, e.g., Austin v. CUNA Mut. Ins. Society*, 232 F.R.D. 601, 605 (W.D.

1

Wis. 2006) ("If the plaintiff makes this showing, the court conditionally certifies a class, authorizes notice and the parties conduct discovery.").

As outlined in Defendant's opening memorandum, however, the depositions that followed the Court's November 29, 2010 Order did not confirm the opt-ins' critical allegation; in fact, the depositions flatly contradicted that allegation. (Dkt. 88, at 5-7.) Again, the opt-ins admitted that their supervisors did not tell them not to record overtime; instead, they were told not to work overtime in the first place. (Dkt. 76-7, Ricker Dep. 24:12-25:7, 40:25-41:4; Dkt. 76-5, Bergeron Dep. 46:10-13; Dkt. 76-6, Fleischmann Dep. 58:18-59:5, 62:21-23; Yang Dep. 24:18-24.) In the span of a few short depositions, the probative allegation that opt-ins were told not to *record* overtime gave way to the innocuous admission that they were told not to *work* overtime. It is no wonder that Plaintiff now argues that the precise instruction does not matter. Her initial iteration has been disproven. Similarly, the initial allegation that WorkBrain would automatically *deduct* one hour from each workday has since given way to the exact opposite truth—WorkBrain automatically *adds* one hour to each workday.

These unequivocal and material contradictions between the deposition testimony and the prior declarations prompted Defendant to request that the Court strike the prior declarations from the record. (Dkt. 77, Section II.A.) Plaintiff evidently agrees with this request, as she has since submitted a new set of declarations, which contradict the initial declarations submitted by the same individuals on a number of key points. (Dkt. 93-96.) In Janine Bergeron's August 5, 2010 declaration, for example, she said:

- "In early 2008, my supervisor informed me that employees were no longer allowed to *record* more than forty (40) hours in a workweek." (Dkt. 38, Bergeron 8/5/10 Decl. ¶ 8, with emphasis.)

2

- "WorkBrain automatically *deducted* one hour from my hours worked for the lunch break regardless of whether I took the break or not." (Dkt. 38, Bergeron 8/5/10 Decl. ¶ 5, with emphasis.)

In her August 15, 2011 declaration, however, Ms. Bergeron now says:

- "In early 2008, Kim Desombre-Long informed me that employees were no longer allowed to *work* more than forty (40) hours in a workweek due to budget concerns." (Dkt. 92, Bergeron 8/15/11 Decl. ¶ 10, with emphasis.)

- "WorkBrain automatically *added* one hour of unpaid lunch to the hours worked for the lunch break regardless of whether I worked through my lunch." (Dkt. 92, Bergeron 8/15/11 Decl. ¶ 7, with emphasis.)

Indeed, in the apparent haste to get her new declaration on file with the Court in time for Plaintiff's Opposition to Defendant's Motion for Decertification, Ms. Bergeron neglected to change the date in the signature block from 2010, to 2011. She also failed to correct a vestigial reference to the prior allegation that "one (1) hour was deducted" for her lunch breaks. (Dkt. 92, Bergeron 8/15/11 Decl. ¶ 8.) Similarly, in Lori Ricker's June 11, 2010 declaration she said:

- "In late 2006 Kohler instituted a policy whereby employees would not be allowed to *record* more than forty (40) hours in a workweek." (Dkt. 39, Ricker 6/11/10 Decl. ¶ 7, with emphasis.)

- "WorkBrain automatically *deducted* one hour from my hours worked for the lunch break regardless of whether I took the break or not." (Dkt. 39, Ricker 6/11/10 Decl. ¶ 5, with emphasis.)

Now, however, Ms. Ricker says in her August 5, 2011 declaration:

- "In late 2006 Kohler instituted a policy whereby employees were not allowed to *work* overtime." (Dkt. 95, Ricker 8/5/11 Decl. ¶ 8, with emphasis.)

- "WorkBrain automatically *added* one unpaid hour each day to reflect a hour long lunch break regardless of whether I took the break or not." (Dkt. 95, Ricker 8/5/11 Decl. ¶ 6, with emphasis.)

Although Ms. Ricker remembered to change the date in the signature block of her new declaration, she, too, failed to edit a reference to her prior claim that "one-hour was deducted" for her lunch breaks. (Dkt. 95, Ricker 8/5/11 Decl. ¶ 7.)

3

While Plaintiff and the opt-ins are certainly entitled to their opinions, they should not be allowed to create their own facts—especially at this late stage in the litigation. At the very least, their willingness to do so casts significant doubt upon their credibility. If they could be this wrong about something as fundamental to their claims as the alleged illegal directive they received or the operation of WorkBrain, how can they be credited on any other point? Defendant respectfully requests that the new declarations, and the old ones, be stricken from the record and the Court's consideration.

**B.     Kohler Co.'s time records comply with the Fair Labor Standards Act.**

In addition to submitting new, and contradictory, evidence, Plaintiff also repeats her assertion that WorkBrain facilitated off-the-clock work because it only captured the elapsed time (i.e., the total number of hours worked each day) and not the actual start and end times of each opt-ins' workday. (Dkt. 92, at 7.) This is a red herring and highlights the shifting sands of Plaintiff's theory. The Fair Labor Standards Act (FLSA) does not require employers to maintain records regarding the start and end times of their employees' work each day. Instead, employers need only record the "[h]ours worked each workday and the total hours worked each workweek" for purposes of tracking their employees' time. 29 C.F.R. 516.2(a)(7). In other words, the FLSA requires employers to record elapsed time, which is precisely what WorkBrain does.

To credit Plaintiff's argument that conduct that is lawful under the FLSA can nevertheless be used to infer a violation of the FLSA is a slippery slope indeed! As Judge Shira Scheindlin put it in a case involving overtime claims of 15,000 current and former police officers and detectives: "In the case of FLSA recordkeeping requirements, employers who retain each category of required records cannot anticipate judicial additions and should not be punished for a failure to do so." *Scott v. New York*, 592 F. Supp. 2d 501 (S.D.N.Y. 2008) (discussing

4

compensatory time off for public employees) (holding that, because there is no requirement that employers maintain records concerning requests for use and denials of use of compensatory time, employees bringing FLSA action for unpaid overtime were not entitled to adverse inference instruction based on failure of employer to maintain records reflecting denials of their requests to use compensatory time). Here, too, Plaintiff and the opt-ins should not be allowed to infer FLSA violations from Kohler Co.'s alleged failure to maintain records that are not required by FLSA.

### C. There is no proof that any of the opt-ins has, in fact, worked any hours for which she was not properly compensated.

Plaintiff cites to the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 66 S. Ct. 1187, 90 L. Ed. 2d 1515 (1946), which, in addition to prompting the portal-to-portal act giving rise to the opt-in requirement, set forth the burdens of proof in claims pursuant to the FLSA. While *Anderson* does set forth the appropriate standard for proving FLSA claims, Plaintiff has glossed over two key points. Before a plaintiff can get the benefit of the just and reasonable inference standard set forth by *Anderson*, he must first prove by a preponderance of the evidence (1) that the employer's records are inaccurate and (2) that "he has in fact performed work for which he was improperly compensated." *Anderson*, 328 U.S. at 687.

In *Anderson*, this was easy. The parties' disagreement centered on whether the employee's preliminary activities and walking time – which neither party disputed were actually occurring and unrecorded – were compensable. *Anderson*, 328 U.S. at 688 ("But here we are assuming that the employee has proved that he has performed work and has not been paid in accordance with the statute. The damage is therefore certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer."). Here, by contrast, the opt-ins are merely "claiming [they] worked hours outside of those recorded in WorkBrain." (Dkt. 92, at 11.) This claim is far from proof by a preponderance that the opt-ins have "in fact

5

performed work for which [they were] improperly compensated." It is also insufficient to establish that Defendant's records are inaccurate. As outlined above, Defendant's records contain the elements required by the FLSA. Defendant is not attempting to shift the burden to Plaintiff; rather, Defendant is merely insisting that Plaintiff establish her initial burden, as set forth in *Anderson*.

Also, contrary to Plaintiff's suggestion, Defendant does not believe that an employee needs to complain about unpaid wages in order to be entitled to them. When an employee does not complain, however, it further eliminates the possibility that the employer knew, or should have known, that she was working hours without compensation. This is especially true when, as here, some of the opt-ins did complain about other issues, including perceived issues with Defendant's overtime calculations.[1] There is also no proof that any Kohler Co. employee, opt-in or not, was counseled, disciplined, or discharged for working overtime or asking to work overtime. In fact, the only proof on this point is that employees were told to record all hours worked, including overtime.[2] Although the absence of complaints or counseling is not fatal to

---

[1] Ms. Bergeron, for example, filed an ethics complaint against her supervisor regarding what she believed was an unfair performance evaluation. (Dkt. 48, DeSombre-Long Decl. ¶ 16.) Although this was towards the end of her employment with Kohler Co., Ms. Bergeron did not mention her schedule, work hours, or compensation during the investigation regarding her complaint. (*Id*.) Ms. Fleischmann, on the other hand, did complain about her compensation on at least two separate occasions. On one such occasion, she took issue with the fact that she had not received daily overtime. (Dkt. 76-6, Fleischmann Dep. 21:20-22:13, 36:7-37:11.) In response, Kohler Co. personnel confirmed that overtime was only paid for hours worked in excess of 40 per workweek. (*Id*. 36:23-37:3.) On a second occasion, Ms. Fleischmann complained that her paid time off was not included when determine if she had worked more than 40 hours in a workweek. (*Id*. 40:17-41:4.) Again, Kohler Co. responded by confirming that hours that were paid, but not worked, did not count towards the 40-hour threshold. (*Id*. 40:25-41:3.) Again, despite these complaints, neither Ms. Bergeron, nor Ms. Fleischmann, nor any other opt-in, complained about hours they had allegedly worked off the clock.

[2] Again, Ms. Ricker's direct and immediate supervisor instructed her on multiple occasions that she was expected and required to enter all of the hours she actually worked, and that Kohler Co. was not a volunteer organization. (Dkt. 49, Kelly Decl. ¶ 11.) Similarly, Ms. Yang was specifically instructed by her direct and immediate supervisor to fully and properly record all of the hours she actually worked, including on one occasion when she worked some hours on the weekend which she had not been authorized to work; in response, her direct and immediate supervisor reiterated Kohler Co.'s policies to her, instructed her to enter the actual hours she had worked (which resulted in her receiving overtime for the week), and informed her that what she had done was unethical and contrary to Kohler Co.'s policies. (Dkt. 50, Loose Decl. ¶ 11.)

6

claims pursuant to the FLSA, it is certainly probative of the ultimate issue in this case: Did the opt-ins, with their supervisors' actual or constructive knowledge, work off the clock?

In an attempt to "prove" that the opt-ins performed work without compensation, Plaintiff also states that opt-in Lori Ricker kept a contemporaneous written record of the actual hours she worked, but would not always transfer the entirety of her hours worked into WorkBrain. (Dkt. 92, at 8.) Such a record could, indeed, support Ms. Ricker's allegation that she worked hours without receiving proper compensation. That is, of course, had she retained it. As Ms. Ricker acknowledged during her deposition, however, she "threw it out." (Dkt. 76-7, Ricker Dep. 33:12-14.) Plaintiff also mentions that opt-in Janine Bergeron kept a similar record to assist her when entering her time at the end of the week. (Dkt. 92, at 8.) Unlike Ms. Ricker, however, Ms. Bergeron did retain this contemporaneous, handwritten record of the hours she worked each day. In fact, she attached each such record to the related WorkBrain timeslip and has retained those records in a binder to this very day. As outlined in Defendant's opening memorandum, however, Ms. Bergeron's handwritten notes did not reveal more hours than the WorkBrain timeslips; instead, her notes perfectly reflected the hours she submitted, and was paid for. (Dkt. 88, at 11.)

Plaintiff also alleges that employees were told they could not work overtime, but that their workloads did not change. (Dkt. 92, at 7.) There is absolutely no proof on this issue, besides, of course, the bald allegations in the contradictory declarations. As significant, the opt-ins admit, and Kohler Co.'s records confirm, that they did, in fact, record and receive overtime even after they allege they were told not to work/record such hours. (Dkt. 88, at 9-17.) Simply put, where the workload required overtime, the opt-ins worked it, recorded it, and were paid for it—and none of them were disciplined or counseled for doing so. Again, there is no proof that any of the opt-ins has, in fact, worked any hours for which she was not properly compensated.

7

## II.     Legal Argument.

Ultimately, Plaintiff suggests that Kohler is being unfair in its expectations, and is demanding an unworkable standard for determining whether employees are similarly situated. Plaintiff's sentiment is generally summarized by the following statement: "Indeed, if plaintiffs were required to be identically situated, as Kohler believes is necessary, no collective action would ever proceed through the 'second stage.'" (Dkt. 92, at 9.) Defendant has never argued for perfect identity between employees but rather, for a proper application of the established facts and law. As outlined below, the cases Plaintiff cites are not on point and fail to establish that she is, in fact, similarly situated to any of the other opt-ins.

The other half of Plaintiff's statement, however, is a little closer to the truth. Just over fifteen years ago, in fact, the Fifth Circuit Court of Appeals pronounced that, "[b]ased on our review of the case law, no representative class has ever survived the second stage of review." *Mooney v. Aramco Services Co.*, 54 F.3d 1207, 1214 (5th Cir. 1995), *overruled on other grounds by Desert Palace Inc. v. Costa*, 539 U.S. 90, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003). This is not to suggest that the statistic holds true today; to the contrary, a number of collective action classes have since withstood decertification. Instead, it is merely a reminder that the similarly situated standard set forth in 29 U.S.C. § 216(b) is not easy to establish. Accepting the Fifth Circuit's research, not a single collective action class met the similarly situated standard in the almost fifty (50) years immediately following the addition of the opt-in requirement to the FLSA. Although some collective action classes have since withstood decertification, Plaintiff's should not be one of them, and the opt-ins should be dismissed as a result.

### A. Plaintiff's cases are not on point.

Plaintiff cites to *Shain v. Armour & Co.*, 40 F. Supp. 488 (W.D. Ky. 1941), regarding the purpose of the collective action. (Dkt. 92, at 13.) Quoting *Shain*, Plaintiff declares that "[t]he FLSA's collective action provision is designed to provide for cases like the present, '**in which the claims of different employees, different in amount but all arising out of the same character of employment**, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other.'" (Dkt. 92, at 13.) Had Plaintiff continued the quotation, she would have recognized that *Shain* is not like the present case:

> The evident purpose of the Act is to provide one law suit in which the claims of different employees, different in amount but all arising out of the same character of employment, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other. In such instances, where liability is denied by the employer, **there are certain questions of both law and fact which are common to all employees engaged in the same character of work such as whether or not the employer is engaged in the production of goods for commerce, whether or not the particular work of the employees involved constitutes the production of goods for commerce, and whether or not any of the existing exemptions apply. It is in accordance with sound public policy to provide for the determination of such common questions, depending as to each employee upon the same identical facts, in one litigation instead of many independent suits.**

*Shain*, 40 F. Supp. at 490 (emphasis added). As far as Defendant knows, there is no dispute that Kohler Co. is, and the opt-ins were, engaged in commerce. In fact, Defendant admitted as much in its Answer and Statement of Defenses. (Dkt. 5, ¶ 55.) Further, the only opt-in making a misclassification claim is the named Plaintiff, Jennifer Vang, and that claim was brought in her individual capacity. (Dkt. 1, ¶¶ 76-105.) Simply put, the common questions of fact and law prompting the statement Plaintiff has excerpted from *Shain* are not present in this case.

As important, the differences alleged by the defendant in *Shain* are far more trivial than those identified by Kohler Co. as the basis for decertification here. According to the court in

*Shain*, "[i]t is of course true, as the defendant contents, that many differences exist between the plaintiff and other employees of the defendant even though engaged in the same type of work, such differences being as to the time worked, wages actually due, and hours of overtime involved." *Id*. at 490. Defendant is not merely identifying differences in amounts that could be due, or quibbling with overtime calculations; to the contrary, the differences identified by Defendant cut to the very basis of Plaintiff's claims. Again, Defendant's liability to Plaintiff, or any of the other opt-ins, depends entirely upon an individualized assessment of each individual's factual and employment setting, including the interactions she had with her individual supervisor. There is no overlapping proof here.

Plaintiff also cites to a number of decisions from Judge Barbara Crabb cautioning against focusing too closely on the differences between opt-ins when considering whether to decertify a collective action. (Dkt. 92, at 13-14.) These words of caution are prudent, as far as they go. For that reason, it is important to note that the decisions of Judge Crabb cited by Plaintiff involved donning and doffing issues—where the opt-ins were generally required to put on, and take off, the same articles without compensation. *See Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F. Supp. 2d 941, 956-57 (W.D. Wis. 2008); *Spoerle v. Kraft Foods Global, Inc.*, 253 F.R.D. 434, 439-40 (W.D. Wis. 2008). In other words, unlike this case, *Kasten* and *Spoerle* both involved periods of time during which it was undisputed that the opt-ins were engaged in activities for which they were not compensated. The question presented by those cases was ultimately whether such activities were compensable. In cases like *those* individual issues should not be overemphasized. Here, by contrast, individual issues are all that exist. There are no periods of time during which the opt-ins were admittedly engaged in activities for which they were not compensated.

10
Case 2:09-cv-00842-WEC   Filed 08/19/11   Page 13 of 17   Document 97

Similarly, Plaintiff cites extensively to *Russell v. Illinois Bell Telephone Company*, 721 F. Supp. 2d 804 (N.D. Ill 2010). (Dkt. 82 at 12, 16, 19, 20.) While *Russell* is one of the cases since *Mooney* to partially withstand decertification, it is important to note that the plaintiffs in *Russell* identified specific, unrefuted policies, applied on a company-wide basis, which they allege caused them to work impaid overtime. These policies included the requirement that call center employees be "open and available" at the start of their shifts, that they meet adherence and average handle time goals, and that any overtime they work is rounded off if it does not exceed eight minutes. *See Russell*, 721 F. Supp. 2d at 814-15. In *Russell*, there was specific proof that periods of time were worked without compensation (i.e., the first seven minutes following the scheduled shift) and that employee workloads and efficiencies were closely monitored (i.e., the adherence and average handle time goals). Here, by contrast, there are only bald allegations.

Finally, Plaintiff makes a point that Defendant cited to a handful of cases in which facts similar to those presented in this case were not sufficient to warrant conditional certification. (Dkt. 92 at 14.) As Plaintiff notes, however, decertification is less lenient, and presents a heavier for her, than conditional certification. (Dkt. 92, at 9.) If Plaintiff's facts are arguably insufficient to warrant conditional certification, they are certainly insufficient to withstand decertification.

**B.     Because Plaintiff has failed to demonstrate that she is similarly situated to any of the other opt-ins, her collective action class should be decertified and the other opt-ins dismissed.**

Plaintiff does her best to argue that she and the other opt-ins are truly in the same boat, and that separate trials could lead them to separate destinations. Taking the analogy one step further, however, demonstrates the fallacy. Each of the opt-ins had a separate captain charged with responsibility for setting her work schedule, reviewing her requests to work overtime, and approving the hours she submitted in WorkBrain. (Dkt. 46, Bashaw Decl. ¶ 2; Dkt. 47, Kulow

11

Decl. ¶ 2; Dkt. 48, DeSombre-Long Decl. ¶ 2; Dkt. 49, Kelly Decl. ¶ 2; Dkt. 50, Loose Decl. ¶ 2.) Based on Plaintiff's allegations, it is this individualized interaction between captain and crew, and only this individualized interaction, which could have resulted in unpaid hours. To the extent the opt-ins reach separate destinations in separate trials, it is because they are not similarly situated to each other with respect to the proof required to establish their claims.

Again, this is not a case donning and doffing case, or one involving uniform rounding practices. In such cases, the parties generally do not dispute the fact that there are periods of time that are not captured for purposes of compensation. The case then centers on whether the employer should be liable to its employees for those periods of time. Because those issues – whether the donning and doffing time is compensable and/or the rounding practices lawful – are common issues uniting all class members, it can hardly be argued that those employees are not similarly situated, even if their individual damages may vary. Borrowing from the Supreme Court in *Anderson*, "[t]he damage is . . . certain. The uncertainty lies only in the amount of damages arising from the statutory violation by the employer." *Anderson*, 328 U.S. at 688.

Here, by contrast, both the damage and the potential amount are uncertain. What's more, the uncertainty can only be resolved by individually examining and assessing the interaction between each of the eight opt-ins and each of their eight supervisors. Again, this is a case where the opt-ins first alleged that they were told by separate individuals not to record the overtime they had already worked, and that the computer system they used to enter their time would automatically deduct from their submissions. Now, however, they each allege that they were told, again by separate individuals, not to work the overtime in the first place. They also admit that the computer system would automatically add to their submissions. These revised allegations require an individualized review of each opt-in's employment at Kohler Co. to

12

determine whether, and to what extent, she is entitled to recovery under the FLSA. If the alleged directive not to work overtime was sufficient to establish that individuals are similarly situated, virtually no employer would be immune from defending against costly collective actions.

In addition to the separate supervisors and shifting allegations, this is also a case in which the individuals collectively recorded and received overtime throughout their employment with Kohler Co., recorded meal periods that were thirty minutes, forty-five minutes, and an hour in length, recorded fewer than forty regular hours in numerous weeks, and modified their daily hours worked to reflect something other than eight hours, even in weeks in which they recorded exactly forty hours. The newly revised, and perfectly lawful, directive, coupled with these objective facts, further demonstrates the difficulty associated with proceeding as a collective action. Not only would each individual's interaction with her direct and immediate supervisor need to be examined, but it would need to be examined with respect to each pay period.

To be clear, separate trials may, indeed, result in different outcomes for these individuals, but that is precisely Defendant's point. There is no common proof in this case. The factual and employment settings of Plaintiff and the other opt-ins are highly individualized. And, although Kohler Co. does, indeed, intend to apply the same defenses to each opt-in, they must nevertheless be applied individually. There is no common proof, for example, that each individual supervisor knew, or should have known, that the opt-in reporting to them was working hours without properly recording them. The only way to confirm or disprove that is by securing the testimony of each of the eight opt-ins, and each of their eight supervisors—sixteen separate individuals, at the very least.

Plaintiff suggests that Defendant is avariciously motivated to argue for separate trials instead of a collective action. Whether, and to what extent, the opt-ins would proceed

13

individually upon decertification is not what matters for purposes of this motion; instead, it is whether they are similarly situated and should be allowed to proceed to trial as a collective action class. As outlined above, they are not, and the collective action class should be decertified.

Finally, Plaintiff has asked the Court to stay decertification for sixty days to allow the dismissed opt-ins time to re-file. Not only is this twice as long as the thirty days prescribed by 28 U.S.C. § 1367(d), but Plaintiff has been alleging throughout that she and the other opt-ins are truly making the exact same claims; certainly it should not take longer than thirty days for the opt-ins to decide if they want to proceed and file the necessary documents.

### III. Conclusion.

Plaintiff has not satisfied her burden of establishing that she and the other opt-ins are actually similarly situated. Defendant respectfully requests that the collective action class be decertified, and the other opt-ins dismissed, as a result.

Dated at Milwaukee, Wisconsin, this 19th day of August, 2011.

        KRUKOWSKI & COSTELLO, S.C.

        s/ Kevin J. Kinney
        s/ Keith E. Kopplin
            Kevin J. Kinney
            *State Bar No. 1003942*
            Keith E. Kopplin
            *State Bar No. 1044861*
            Krukowski & Costello, S.C.
            1243 N. 10th Street, Ste. 250
            Milwaukee, WI 53205
            (414) 988-8400
            (414) 988-8402 Facsimile
            E-mail:kjk@kclegal.com
            E-mail: kek@kclegal.com

        ATTORNEYS FOR DEFENDANT KOHLER CO.